**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Jamal Samaha, Lauren Coleman, Jordan Meyer, Andy Delany, Mary Grace, Bonnie Brown, and Jonathan Mason, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

The City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his official and individual capacity*; and John Does 1-100, *in their official and individual capacities*,

Defendants.

Case No. 20-cv-01715 (SRN/DTS)

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS CITY OF MINNEAPOLIS AND MEDARIA ARRADONDO**

---

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (citing *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). Plaintiffs, and the many hundreds of class members they seek to represent, were the victims of excessive force and retaliation at the hands of John Doe Defendants, because of the policies, practices, and customs of the City of Minneapolis and Chief Arradondo ("Defendants"). Plaintiffs and class members watched in horror as the life of George Floyd was snuffed out by a Minneapolis police officer. Plaintiffs protested not only that act of police brutality, but the longstanding and pervasive system of oppression that resulted in

Mr. Floyd's death. Despite being entirely peaceful, Plaintiffs were met with more police brutality and were subjected unreasonable use of tear-gas, pepper spray, and rubber bullets. Defendants' motion does not contest the plausibility of the excessive force and first amendment retaliation allegations.

Defendants' motion to dismiss should be denied because it largely misrepresents the facts in Plaintiffs' Complaint, relies on the wrong standard of review, and cites no applicable authority in support of its position. There were not merely ten incidents as Defendants would like this Court to believe. There were hundreds of incidents, many of which were televised on live broadcasts and recorded and preserved on social media. The Defendants, including Chief Arradondo, knew what their officers were doing, and Defendants' attempts to claim ignorance and dismember the allegations of the complaint should be rejected.

## FACTS

Plaintiffs allege that, after the murder of George Floyd by former Minneapolis Police Department ("MPD") officer Derek Chauvin on May 25, 2020, there were widespread, large-scale, protests throughout Minneapolis expressing grief and outrage against racism and racialized police violence that called for systematic change. ECF No. 1 ("Compl."), ¶ 2. The protests were peaceful. While it is undeniable that at certain places and times rioting did ensue in Minneapolis, no rioting occurred at any of the protests described in the Complaint. Nevertheless, demonstrations were often met with unreasonable and excessive shows of force from Defendants, including pepper spray, mace, tear gas, rubber bullets, and flash bangs. *Id.*, ¶ 3, 30-31, 33-34, 36-37, n.4-6, 8.

Plaintiffs further allege that this response is part of an established pattern and practice of the Defendants' use of excessive force when engaging with the civilians it is meant to serve and protect, and a continuation of a longstanding pattern and practice of using excessive force on the citizens of Minneapolis. *Id.*, ¶¶ 180-88, n.32-42.

Commenting on the MPD response to the demonstrations, Minneapolis City Council member Jeremiah Ellison told MPR that this response was typical: "We always do this—we create a barrier, put the police out there, put them in a line, put face masks, depersonalize them, make them look as scary as possible." *Id.*, ¶ 34. From May 25, 2020 to May 31, 2020, protestors were subjected to repeated, government-sanctioned, use of excessive force by Defendants: over this time period, there were at least 82 recorded uses of force deployed by MPD officers including the use of chemical irritants, gun point displays, and less-lethal munitions. *Id.*, ¶ 182. Plaintiffs and other protesters were subjected to Defendants' excessive use of force at demonstrations throughout the city, including those on the I-35W bridge, in Downtown Minneapolis, and near the 3rd and 5th precincts. *Id.*, ¶¶ 30, 33, 36, 40-42, 54, 60, 64-65, 68-69, 72, 80, 85, 94, 106, 116, 124, 134, 142, 153; *see also See Goyette, et al. v. City of Minneapolis, et al.*, No. 20-CV-01302 (WMW/DTS)[1], City Defendants' Answer, ECF No. 66, ¶ 84 ("City Defendants admit an occupant in Squad Car 181 dispersed pepper spray out the window on May 28

---

[1] The *Goyette* and *Linda Tirado v. City of Minneapolis, et al.*, Case No. 20-cv-1338 (JRT-ECW) (D. Minn. June 10, 2020) are specifically referenced in the Complaint at paragraph 168. The Court can also take judicial notice of legal filings and other public records. *See Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005). Defendants also cite to the *Goyette* complaint in their motion to dismiss. Defs.' Brf at 2.

in the evening"); *id.* ¶ 85 ("City Defendants admit the allegations in Paragraph 85 that officers pepper sprayed the crowd in order to get them to move away."); *id.* ¶ 86 ("Admit that another officer sprayed something in [journalist's] face."); *id.* ¶ 117 ("City Defendants admit the allegation in Paragraph 117 that police fired tear gas and less-lethal projectiles near the Fifth Precinct on May 30 and attempted to disburse rioters.").

On May 29, the Multi-Agency Command Center ("MACC")—operating under the Minnesota Department of Public Safety—was activated to coordinate the multi-agency response to the citywide protests. *Id.*, ¶ 57. The agencies represented included a number of state and municipal entities including the MPD; Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling Enforcement, Division of Homeland Security and Emergency Management, State Fire Marshal division, Minnesota State Patrol); National Guard; Saint Paul Police Department; Metro Transit Police; Bloomington Police; University of Minnesota Police; Sheriff departments from Ramsey County, Hennepin County, Anoka County, Dakota County, Washington County; and the FBI. *Id.*, ¶ 57. Mayor Jacob Frey tweeted about how this coordinated effort included MPD. *Id.*, ¶ 59. The MACC centralized law enforcement efforts to ensure that all agencies and municipal entities were acting in coordination with one another. *Id.*, ¶ 58; *see also Goyette*, City Defendants' Answer, ¶ 34 ("City Defendants admit the MACC was set up so multiple agencies could coordinate their response to the protests.").

Defendants' response during May 25 to May 31 is part of a larger pattern and practice of using excessive force when engaging with civilians. *Id.*, ¶ 180. From 2011 to

2013, fifty-three lawsuits alleging that officers used excessive force were filed against the MPD. *Id.*, ¶ 183. This pattern and practice goes back further still: from 1983 to 1987, 227 complaints of excessive force were filed against the MPD. *Id.*, ¶ 184. The longstanding nature of these policies, practices, customs, resultant lawsuits, and the international media attention given to the protests and law enforcement response from May 25 to May 31, necessarily put the City of Minneapolis on notice of the MPD's unconstitutional conduct. *See Goyette*, City Defendants' Answer ¶ 20 (admitting "The public unrest became international breaking news. Numerous members of the news media arrived to cover the demonstrations and unreset [sic] and the government response.")

MPD Policy specifically states that "[o]fficers shall not deploy 40 mm launchers for crowd management purposes" and that 40-mm rounds can cause grievous injury and should therefore be reserved "for the incapacitation of an aggressive, noncompliant subject." Compl., ¶¶ 166-67. MPD Policy also states that the use of de-escalation tactics are preferred "whenever reasonable…to avoid or minimize use of force," which include the "[a]voidance of physical confrontation, unless immediately necessary (e.g. to protect someone or stop dangerous behavior)." 5-304(B)(2) De-escalation. *Id.*, ¶ 170. Despite the non-aggressive conduct of Plaintiffs and most protestors, they were not met with de-escalation tactics; instead, they were indiscriminately fired at, without warning, with less-than-lethal weapons. *Id.*, ¶¶ 30, 33, 36, 60, 64-69, 90; *see also Goyette*, City Defendants' Answer, ¶ 21 ("City Defendants admit confrontations occurred during this period and some necessitated the use of less-lethal ballistics and chemical irritants without

forewarning, but City Defendants deny that every such confrontation occurred without forewarning.”).

As of May 27, 2020, MPD Policy stated that the on-scene incident commander had a duty to evaluate the overall situation and determine what use of force was reasonable under the circumstances, noting that unless there is an immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance until it has been authorized by the on-scene incident commander.” *Id.*, ¶ 174. From May 25 to May 31, authorization for use of force was given as a blanket authorization by the on-scene commanders, rather than on an incident-by-incident basis. *Id.*, ¶ 176. While the identities of the on-scene incident commanders from May 25 to May 31 are mostly unknown, the “ranking officer or supervisor” fills this role until “relieved of this responsibility by a higher authority,” typically the Police Supervisor. *Id.*, ¶¶ 177-78, n.31. Where multiple state and municipal entities are involved, as was the case from May 27 to May 31, *id.*, ¶ 57, the on-scene incident commander may often be from other municipal departments. *Id.*, ¶ 177. The identities of those with supervisory duties also remain unknown, as this information is uniquely in the hands of Defendants. *Id.*, ¶ 179.

Defendants’ decision to ignore their own policies constitutes a custom of failing and refusing to follow policies designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the

rights of Plaintiffs and other protestors in violation of their Constitutional rights. *Id.*, ¶ 173.

## ARGUMENT

### I. Legal Standard for a Rule 12(b)(6) Motion

On a motion to dismiss, courts must accept all of the plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In short, a complaint must contain sufficient facts, accepted as true, "to state a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). The plausibility standard does "not require heightened fact pleading of specifics." *Twombly*, 550 U.S. at 570; *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc) ("Plaintiffs 'need not provide specific facts in support of their allegations.").

Importantly, at this pleading stage, courts cannot weigh "competing inferences" or "credit a defendant's counterallegations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). The complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Smith v. Questar Capital Corp.*, No. 12-CV-2669 SRN/TNL, 2013 WL 3990319, at *2 (D. Minn. Aug. 2, 2013) (J. Nelson) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d

585, 594 (8th Cir. 2009)). Courts undertake the "context-specific task" of determining whether a plaintiff's allegations "nudge" its claims against a defendant "across the line from conceivable to plausible." *See Iqbal*, 556 U.S. at 679-80. "A motion to dismiss a complaint should not be granted unless it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him to relief." *Questar Capital Corp.*, 2013 WL 3990319, at *2.

## II. Plaintiffs Adequately Plead a Claim Against Defendant Arradondo in His Individual Capacity

Defendants agree that "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, *or direct responsibility for*, a deprivation of his constitutional rights." ECF No. 14 ("Defs.' Brf.") at 8-9 (citing *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)) (emphasis added); *see also* Defs.' Brf. at 11-12 (citing *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Plaintiffs plead sufficient facts to nudge their claims against Defendant Arradondo in his individual capacity from conceivable to plausible. Plaintiffs allege that MACC and incident command were where the decisions were made and that high-ranking MPD officers, which would include Defendant Arradondo, were involved in both. Compl., ¶¶ 57-59, 174. Plaintiffs further allege that Defendant Arradondo had direct responsibility for "order[ing], authoriz[ing], and/or acquiesce[ing]" in the uses of force, even if he was not one of the officers personally doing the spraying or shooting. Compl., ¶ 19. Plaintiffs allege, as there has been no discovery conducted to date, that Defendant

Arradondo was, in the least, overseeing and ordering his officers' use of force. This is not a conclusory allegation, as Defendants argue; it is a factual statement and, when coupled with the other allegations of the MACC and incident command, compl., ¶¶ 19, 57-59, 174, it renders plausible Defendant Arradondo's personal involvement in the decisions to use force. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) ("In order to survive a motion to dismiss, a prisoner need not plead more than that the warden was directly involved in the decision.").

It is also for these reasons that Defendants' comparison to the conclusory allegations in *Iqbal* are disingenuous. Defs.' Brf. at 10-11. Clearly, the chain of command between Iqbal and the AG and FBI director is far more attenuated and vast than between Defendant Arradondo and the Plaintiffs and class members. Further, Defendant Arradondo did not merely "know of" or "condone" the officers' use of force—he directed it from incident command or the MACC. Compl., ¶¶ 19, 57-59, 174. Further, the Court noted the lower court's concern about subjecting "high-ranking Government officials…charged with responding to a 'national and international security emergency unprecedented in the history of the American Republic'…to the burdens of discovery." *Iqbal*, 556 U.S. at 670 (internal citation omitted). This is hardly the case here. MPD and Defendant Arradondo have had to implement crowd-control techniques many times before in the regular course of their employment, as is evidenced by inclusion of such techniques in the MPD policy handbook. *See*, *e.g.*, Compl., ¶¶ 163-78.

Plaintiffs allege "supervisors" and Defendants had notice of the uses of force via the use of MPD's force reporting system, compl., n.33, and the widespread media

coverage, *see*, *generally*, compl. The Complaint cites to an article quoting Defendant Arradondo's commentary on the MPD's use of force, and discussing how policy changes have been made to address the blanket authorizations to use force. Compl., ¶ 175, n.33. Defendant Arradondo is quoted as defending the MPD's use of force in response to peaceful protests as supposedly needed to preserve life.[2] Defendant Arradondo's comments make it plausible, if not probable, that Arradondo had first-hand knowledge of the uses of force because he was the one who authorized the uses of force and/or acquiesced to its continued use. *See Jackson v. Nixon*, 747 F.3d 537, 544–45 (8th Cir. 2014) (holding that supervisor's duty to administer and supervise prison system demonstrated his personal involvement in and supervisory liability for violations arising from prison program).

Moreover, "a supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates." *Hahn v. McLey*, 737 F.2d 771, 773 (8th Cir. 1984) (per curiam). There is no question that individuals may be liable under Section 1983 for their supervisory failures. *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) ("[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity."). Although "[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign

[2] Libor Jany, Liz Sawyer, *Complaints skyrocket over police response to George Floyd protests*, STAR TRIBUNE (July 2, 2020, 10:01 PM), https://www.startribune.com/complaints-skyrocketing-in-wake-of-mpls-police-response-to-floyd-protests/571608232/

supervisory liability," *Howard v. Adkinson*, 887 F.2d 134, 138 (8th Cir. 1989), no more than two prior incidents are needed to find a supervisor liable, *see Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (two complaints are not enough to impose *Monell* liability on city, but are enough for supervisory liability). The Complaint plausibly alleges Defendant Arradondo directed, coordinated, and was aware of his officers' use of less lethals against Plaintiffs and class members. This awareness demonstrates a failure to supervise and train these officers.

## III. Plaintiffs Adequately Pleaded a *Monell* Claim Against the City of Minneapolis

Plaintiffs allege the City of Minneapolis is liable, not because it merely employs a tortfeasor, but instead because "the [constitutional] violation[s] resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013)); *see* compl., ¶¶ 173, 188, 203-13. Defendants would have this Court believe that Plaintiffs' Complaint alleges a few, isolated incidents of unlawful force and unlawful retaliation. Defs.' Brf. at 12-13 (citing *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997) (vacating judgment based on single, isolated incident) and *Dahl v. Rice County, Minn.*, 621 F.3d 740, 743–44 (8th Cir. 2010) (finding no municipal policy behind single decision)). This is not what Plaintiffs allege. Plaintiffs allege many incidents of excessive uses of force by many officers, over a series of days. *See* Compl., ¶¶ 30, 33, 36, 40-42, 54, 60, 64-65, 68-69, 72, 80, 85, 94, 106, 116,

124, 134, 142, 153. The notion that hundreds of incidents of excessive force were committed by rouge officers acting independently is laughable as a matter of common sense, but more importantly is directly contradicted by Plaintiffs' allegations. *See id.*, ¶¶ 57-59, 174, 176-78.

### A. Plaintiffs Allege a Policy or Custom Is the Moving Force Behind Plaintiffs' Constitutional Violations

Defendants' sole argument for dismissal of Plaintiffs' claims that a policy was the moving force behind the constitutional violations is that Plaintiffs have failed to name the policy that is unconstitutional. Defs.' Brf. at 13-18. A local government may be sued directly if it is alleged to have caused a constitutional tort through a "policy": "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)). "A plaintiff need not identify a specific unconstitutional policy to survive a motion to dismiss." *Hall v. City of St. Louis*, No. 4:19-CV-02579 JCH, 2020 WL 2933167, at *5 (E.D. Mo. June 3, 2020); *Aldridge v. City of St. Louis, Missouri*, No. 4:18-CV-1677 CAS, 2019 WL 1695982, at *10 (E.D. Mo. Apr. 17, 2019) (citing *Crumpley-Patterson v. Trinity Lutheran Hospital*, 388 F.3d 588, 591 (8th Cir. 2004)). A plaintiff must, however, "allege facts that would support the drawing of an inference that the conduct complained of resulted from the existence of an unconstitutional policy or custom. Accordingly, a complaint is not deficient because it fails to incorporate language

specifically alleging the existence of an unconstitutional policy or custom." *Id.* (citing *Doe ex rel. Doe v. School Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)).

Also, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). To make out a claim based on an unconstitutional custom, a plaintiff must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

"When a Complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." *Doe ex rel. Doe*, 340 F.3d at 614. Plaintiffs specifically allege a pattern of conduct, both historically and during the protests following the murder of George Floyd, where MPD officers engaged in excessive force. Compl., ¶¶ 180-88; *see also*, *generally*, *Goyette*, Seconded Amended Complaint, ECF No. 53. Plaintiffs also specifically allege a pattern of conduct where MPD officers used chemical agents without warning against hundreds peaceful protestors (protesting police brutality) in retaliation for protesting. For example:

- MPD officers persistent use of excessive force when policing peaceful protests at which police brutality is being protested;
- MPD's policy or custom of issuing no dispersal orders or of issuing vague or contradictory dispersal orders without giving an opportunity to comply;
- MPD's policy or custom of declaring and assuming the peaceful protests were "civil disturbances" when there was no threat of force or violent activity;
- MPD Policy Section 5-312, allowing on-scene incident commander to "determine if it would be a reasonable force option to use less-lethal or non-lethal weapons" in a civil disturbance, *see* compl., ¶ 174, does not allow for blanket authorizations of force, which is what Plaintiffs' allege occurred during the protests;
- Arresting peaceful protestors without probable cause and in violation of their constitutional rights;
- MPD's failure to adequately train, supervise, and/or discipline police officers and/or City officials concerning the practices described above to assure compliance with City and/or Department policy, state and federal laws, and the Constitution of the United States;
- MPD's custom, practice, or policy of using less-than-lethal force, without warning and/or without time for disbursement, on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting.

*See* Compl., ¶¶ 188, 204. While Plaintiffs cannot allege *all* of the policies, persistent practices, and customs that led to the violations of their rights because no discovery has been conducted, many of the pertinent policies are cited in the Complaint. *See* Compl., ¶¶ 4, 5, 163-78. *See Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (denying motion to dismiss and finding factual allegations sufficient to support a *Monell* claim where they supported inferences of a custom, stating that more "information concerning a town's customs or policies, the policymakers' motivations behind such policies, or the facts surrounding police department customs, are typically unavailable to an outsider."). Plaintiffs have alleged what is required: that specific

policies or customs exist and were the moving force behind the constitutional violations they suffered. *See, e.g.*, *Laney v. City of St. Louis, Missouri*, No. 4:18 CV 1575 CDP, 2019 WL 2423308, at *5 (E.D. Mo. June 10, 2019) (denying motion to dismiss *Monell* claims); *Aldridge*, 2019 WL 1695982, at *10 (same); *Newbold v. City of Saint Louis, Missouri*, No. 4:18CV1572 HEA, 2019 WL 3220405, at *4 (E.D. Mo. July 16, 2019) (same).

Plaintiffs seek to represent two putative classes. Compl. ¶ 190. The prior incidents and lawsuits alleged in the Complaint, at ¶¶ 180-88, and discussed by Defendants, Defs.' Brf. at 19-23, go to establishing a custom of using excessive force, generally, perpetrated by MPD and relates to the allegations in support of the second class. Other courts have found similar allegations sufficient to support a pattern and practice claim to survive a motion to dismiss. In *Simpson v. Ferry*, the district court found that the plaintiff sufficiently pleaded a widespread practice of use of excessive force when the plaintiff included in the complaint statistics as to how many lawsuits were brought against the City of Philadelphia during a five-year period, how much in damages were paid for those lawsuits, and that approximately one-third of the lawsuits included allegations of excessive force. 202 F. Supp. 3d 444, 453 (E.D. Pa. 2016). The Court reasoned:

> I am cognizant that mere allegations, and even settlements, do not establish liability or the existence of an unlawful custom. Nevertheless, at this early stage I must assume the veracity of these statistics, view them in the light most favorable to Plaintiff, and consider them in conjunction with Plaintiff's personal history of being targeted by the police. Viewed through this lens, I conclude that Plaintiff has sufficiently pled a "widespread" practice of excessive force.

*Id.* Similarly, in *Flanagan v. City of Dallas, Tex.*, the district court held that plaintiff had pled sufficient facts to support an inference of a persistent, widespread practice of officers using excessive force rising to the level of a custom having the force of policy where plaintiff included in the complaint allegations that Dallas was at the top of the list of police misconduct statistics in the South, the total number of officer-involved shootings, the number of grand juries convened to investigate police misconduct, the number of unarmed individuals killed by Dallas police officers, and the number of open internal affairs investigations into officer-involved shootings. 48 F. Supp. 3d 941, 952-53 (N.D. Tex. 2014); *see also Sanchez v. Gomez*, 283 F. Supp. 3d 524, 536 (W.D. Tex. 2017) (stating that a plaintiff could properly plead a *Monell* claim on the basis of a widespread pattern or practice of excessive force by pleading "a combination of statistics, past incidents, and statements by city officials."); *Oporto v. City of El Paso*, No. EP-10-CV-110, 2010 WL 3503457, at *5 (W.D. Tex. Sept. 2, 2010) (holding that plaintiff's complaint alleging thirty-two prior incidents spanning fifteen years "in varying degrees of detail" was sufficient to defeat defendant's motion to dismiss).

**1) There were significantly more than "10 instances" of excessive force**

Finally, Defendants mischaracterize and discount Plaintiffs' allegations with respect to the excessive uses of force taken against peaceful protestors in the week after George Floyd's murder. Defs.' Brf. at 23-28 ("More specifically, the complaint alleges that chemicals [sic] irritants were used specifically in 10 instances on May 28, 30 and 31."). Taking Plaintiffs allegations as true, hundreds, if not thousands, of people were at

the peaceful protests along with Plaintiffs, as seen in the photos in the Complaint. Compl., at 21, 25. Of these, hundreds of people were pepper sprayed, tear gassed, shot with rubber bullets, and subjected to other displays of excessive force. In fact, Defendants themselves cite to the *Goyette* complaint in their fact section. Defs.' Brf. at 2. Through this, Defendants implicitly acknowledge that there are more than "10 incidents."

Plaintiffs specifically referenced the *Goyette* and *Tirado* complaints, and related their case to the *Armstrong v. City of Minneapolis* complaint. In those three complaints, six named plaintiffs were allegedly subjected to excessive use of force while peacefully protesting or covering the protests as a member of the media; *Goyette* and *Armstrong* bring these claims on behalf of hundreds of similarly affected putative class members. In total, eight complaints have been filed in the District of Minnesota. *See Goyette*, *Tirado*, *Armstrong, Williams v. City of Minneapolis*, 0:20-cv-01303 (D. Minn.); *Marks v. Doe 1, et al.*, 20-cv-01913 (D. Minn.); *Cisneros v. City of Minneapolis, et al.*, 20-cv-01957 (D. Minn.); *Stevenson v. Doe 1, et al.*, 20-cv-02007 (D. Minn.). Injuries include the blinding in one eye of multiple protesters and widespread use of "less lethal munitions, widespread exposure to tear gas and pepper spray, and miscellaneous injuries stemming from other uses of excessive force. *Id.* In total, 22 plaintiffs have brought similar claims, with many of the complaints describing conduct impacting hundreds, if not thousands of peaceful protestors. Moreover, because Plaintiffs represent a putative class, the ten incidents experienced by the seven named Plaintiffs must be viewed illustratively, not exhaustively.

"The Eighth Circuit has not directly addressed the quantum of 'continuing, widespread, persistent' conduct that a plaintiff must allege to satisfy the *Iqbal* standard in [the motion to dismiss] context, though it has held that isolated incidents do not suffice and that allegations of "many" incidents do establish liability." *Ball-Bey v. Chandler*, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019) (citing, respectively, *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322-23 (8th Cir. 1986) and *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987)). Defendants cite to *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (citing favorably to *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002)) in support of their argument that ten incidents is insufficient. *Brewington* held that evidence of two prior incidents of excessive force from several years prior fell short and granted summary judgment. 902 F.3d at 801-02. *Pineda* similarly found that eleven incidents over four years were insufficient. *See Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1070 (S.D. Tex. 2000).

Other courts consider the seriousness of the incidents when determining what the sufficient number of incidents is to establish a pattern of conduct. *See, e.g.*, *Harper v. City of Dallas*, *Texas*, No. 3:14-CV-02647-P, 2015 WL 13729793, at *3 n.1 (N.D. Tex. Aug. 13, 2015) (denying motion to dismiss when plaintiff alleged eight factually similar incidents over the course of the year as sufficient to support a reasonable inference of a persistent, widespread practice of excessive force); *Webster v. City of Houston*, 735 F.2d 838, 852 n.43 (5th Cir.), *on reh'g*, 739 F.2d 993 (5th Cir. 1984) ("Where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to

be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation.”).

At the pleadings stage, the allegations of hundreds of factually-similar and serious incidents widely publicized on various media channels around the world over the course of a week are sufficient to meet the plausibility standard. *See Cantu v. City of Portland*, No. 3:19-CV-01606-SB, 2020 WL 2952972, at *1 (D. Or. June 3, 2020) (denying motion to dismiss plaintiff’s *Monell* claim alleging the existence of an unconstitutional custom where complaint included a “general time period and description of related protests” during which the Portland police used excessive force). The complete reliance on summary judgment cases by Defendants demonstrates the legal insufficiency of their motion to dismiss, as they cannot point to any cases where a motion to dismiss was granted in similar circumstances.[3] The allegations by 22 named plaintiffs, describing scores of impact protestors over a seven-day period is more than sufficient at the pleadings stage.

---

[3] *See, e.g.*, *Appel v. City of St. Louis*, No. 4:05-CV-772 SNL, 2007 WL 9808053, at *16 (E.D. Mo. Aug. 15, 2007) (“The record contains no evidence from which the Court could infer that MacEnulty and the Police Defendants acted pursuant to a City policy or custom.”); *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 829 (8th Cir. 2013); *Board of Comm’rs v. Brown*, 520 U.S. 397, 400 (1997); *Hoekstra By and Through Hoekstra v. Independent School Dist. No. 283, St. Louis Park, Minn.*, 916 F.Supp. 941, 947 (D. Minn. 1996); *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001) (applying “stringent standard of fault” at summary judgment); *Burbridge v. City of St. Louis, Missouri*, 430 F.Supp.3d 595, 620 (E.D. Mo. 2019).

### 2) Plaintiffs adequately plead knowledge of the Defendants

Defendants argue that Plaintiffs fail to allege that Defendants were deliberately indifferent to or tacitly approved of the alleged misuses of force. Defs.' Brf. at 24-25. Defendants wrongly claim that "Plaintiffs do not plead any specific facts showing that Defendants were even aware of the purportedly unconstitutional acts occurring" during the week in May. Defs.' Brf. at 25. *Monell* liability will attach if a custom or practice is so pervasive and widespread that the municipality had either actual or constructive knowledge of it. *Olson v. City of Elk Point, S.D.*, 655 F. Supp. 2d 973, 976 (D.S.D. 2009) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). "Imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was 'so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of [it].'" *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)). Defendants ignore all of the other allegations in the Complaint demonstrating knowledge and wrongly expect Plaintiffs to have put forth *evidence*, as if at summary judgment. Defs.' Brf. at 25-26. Plaintiffs plead sufficient facts showing Defendants' actual and constructive knowledge of the misuses of force:

- Governor Walz held many live press conferences throughout the week of protests and violence, addressing the situation on the ground. *See* Compl., n.15.
- Every local and many major news stations had a correspondent live on the ground in the middle of the protests during the evening news. *See* Compl., n.3, 4, 5, 6, 11, 12, 18, 19.

- MPD officers must report to their supervisor and file a CAPRS report notifying Defendants of uses of force. Compl., ¶ 182, n.33.

Moreover, "the sheer numerosity of incidents can provide evidence of constructive knowledge." *Pineda*, 291 F.3d at n.13; *see also id.* at n.15; *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) ("Sufficient duration or frequency of abusive practices ... must warrant a finding of knowledge on the part of the governing body that the objectionable conduct has become customary practice of city employees.").

The important difference between the summary judgment and pleading standards is again made clear by Defendants own citation to *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019), where the Court granted summary judgement. *Baude v. City of St. Louis*, No. 4:18-CV-1564-RWS, 2020 WL 4470846, at *6 (E.D. Mo. Aug. 4, 2020), concerned the same protests as those in *Burbridge*, which is cited by Defendants, Defs.' Brf. at 28. Declining to follow *Burbridge*, the *Baude* court emphasized that *Burbridge* was decided at the summary judgment stage and thus had "benefited from additional factual development that ha[d] yet to occur" in *Baude*. Rather, the *Baude* court found that plaintiff had pled sufficient facts that stated a claim for municipal liability by alleging that defendants had "witnessed officers in their command using excessive force but failed to intervene," and had "issued the orders allowing the use of force against the crowd, which was not violent, largely compliant, and unable to flee." *Baude*, 2020 WL 4470846, at *8. Similar to this case, it is not "pure speculation to assume" Defendants were deliberately indifferent to or tacitly approved of the alleged misuses; it is entirely plausible based on the facts alleged in the Complaint that the

Defendants tacitly approved of the MPD officers' repeated uses of force because the repeated uses of force kept occurring, despite making international news. *See Baude*, 2020 WL 4470846, at *8. The Court must take the Plaintiffs' factual allegations as true at this stage, something Defendants are reluctant to do.[4]

**3) Defendants' affirmative allegations in their memorandum are inappropriate.**

Defendants spend a lot of time arguing and "affirmatively [pleading]" that their policies are facially constitutional. Defs.' Brf. at 13-18. This is inappropriate on a Rule 12(b)(6) motion. *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008) ("When ruling on a motion to dismiss under Rules 12(b)(6) or 12(c), a district court generally may not consider materials outside the pleadings."). Additionally, courts in other jurisdictions have found that whether an official policy is facially constitutional is not dispositive of whether it nonetheless perpetuates unconstitutional conduct by officers: "A jury readily could [find that the] Professional Standards was nothing more than a facade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers." *See, e.g., Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996).

---

[4] To the extent Defendants inject their own version of events that are inconsistent with the Complaint, Def. Brf. at 13-18, 27-28, these "affirmative allegations" by the Defendants should be ignored. This is not a summary judgment motion and such affirmative pleading is improper.

**B. Training, Supervision, Discipline Claims**

Defendants argue that Plaintiffs allege no facts in support of their failure to supervise and train claim. Defs.' Brf. at 29-31. This is incorrect. Plaintiffs allege the existence of many MPD policies, *see* Compl. ¶¶ 4, 5, 163-78, and allege that MPD failed to "adequately train, supervise, and/or discipline police officers and/or City officials concerning the practices described above to assure compliance with City and/or Department policy, state and federal laws, and the Constitution of the United States." Compl. ¶ 204(f). A supervisor will be held liable for failure to train where a "reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue." *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). This notice of deficiency can be proved where a pattern of misconduct indicates that employees' responses to a regularly recurring situation are insufficient to protect constitutional rights. *See S.J. v. Kansas City Missouri Public School Dist.*, 294 F.3d 1025, 1029 (8th Cir. 2002). Given that there were hundreds of repeated and similar instances of excessive force and retaliation used on peaceful protestors during the week, it is entirely plausible that MPD failed to supervise and train its officers on when to appropriately deploy less lethals and chemical irritants. In the same way as above, *see supra* at 20, Defendants were on constructive, if not actual, notice that that the training and supervision of its officers was deficient.[5] *See e.g.*, *Spell v. McDaniel*, 824 F.2d 1380,

---

[5] Again, Defendants rely on cases analyzing evidence submitted in connection with a motion for summary judgment. Def. Brf. at 29-31 (citing *Evenstad v. Cty. of Hennepin*, No. CV 04-1124 (JMR/FLN), 2006 WL 8445284, at *7 (D. Minn. May 22, 2006), *report*

1393 (4th Cir. 1987) (constructive knowledge established by plaintiff providing testimony of seven lay citizens of the municipality who "observed or directly experienced acts of brutality by city police officers of the type charged to [plaintiff]").

## IV. Plaintiffs Have Standing to Seek Declaratory and Injunctive Relief

Plaintiffs are asserting claims on behalf of themselves and two putative classes for violations of their rights to exercise their first amendment rights and to be free from excessive force based on an ongoing pattern and practice pursuant to a policy, custom, or failure to train or supervise. These allegations indicate that Defendants' unconstitutional conduct will continue into the future by virtue of the fact that the pattern and practice continue on. To be clear, the relief Plaintiffs and the class seek is prospective in nature, requiring Defendants to conform their future conduct to federal law based on what they have done in the past.

Each Plaintiff alleged that they will continue peacefully protesting in the future and that the Defendants' actions chilled their right to free speech and peaceful assembly. Compl. ¶¶ 10-16. "A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'" *Index Newspapers LLC v. United States Marshall Services*, --- F.3d ---, 2020 WL 5988501, at *5 (9th Cir. Oct. 9, 2020) (citing *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Balogh v. Lombardi*, 816 F.3d 536,

---

*and recommendation adopted*, No. 04-CV-1124 (JMR/FLN), 2006 WL 8445281 (D. Minn. July 20, 2006) and *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991)). The evidentiary standards are vastly different, rendering these cases inapposite.

542 (8th Cir. 2016) ("A chilling effect on speech protected by the First Amendment can constitute an injury in fact."); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury."). Plaintiffs' rights have been chilled by the Defendants' policy, custom, and failure to train, and this is an imminent and ongoing injury. *Index Newspapers*, 2020 WL 5988501, at *5.

Defendants call Plaintiffs' risk of future injury "too speculative to establish standing." Defs.' Brf. at 33. But Defendants again ignore the plight of our times. There have been more protests in Minnesota around the same issues: when people thought MPD officers had shot a black man in downtown Minneapolis, when in fact he had committed suicide, peaceful protests evolved and were met with MPD resistance[6]; when former MPD officer Derek Chauvin was released on bond, peaceful protests occurred and were met with MPD resistance[7]; and when the judge presiding over the murder case of George Floyd dismissed one count against Derek Chauvin, peaceful protests began and ended with the National Guard being called in.[8] Just yesterday, on November 4, 2020, a march

[6] Michael Levenson, *Minneapolis Homicide Suspect's Suicide Spurs More Protests, Police Say*, N.Y. Times, Aug. 26, 2020. https://www.nytimes.com/2020/08/26/us/minneapolis-protests-unrest.html

[7] Abby Simons, *More Than 50 Protesters Arrested During Faceoff With Law Enforcement in Minneapolis After Derek Chauvin Release*, Star Tribune, Oct. 8, 2020. https://www.startribune.com/51-arrested-near-fifth-precinct-hq-after-protesting-chauvin-release/572670582/

[8] Amy Forliti, Judge Dismisses One Charge Against Former Cop in Floyd's Death, A.P., October 22, 2020. https://apnews.com/article/thomas-lane-minnesota-minneapolis-racial-injustice-tou-thao-cac924c53dd1fb2515346fbd9631cb8f

organized by Twin Cities for Justice 4 Jamar and the National Alliance Against Racist and Political Regression ended in the mass arrest of 646 people and children.[9]

Defendants rely on one out of circuit case, *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006), to support its argument that named Plaintiffs' allegations of future injury are too speculative to warrant injunctive relief. Defs.' Brf. at 33-34. The *Elend* court however, explained that "[p]laintiffs' intention in this case to protest 'in concert with presidential appearances at the USF Sun Dome and at other locations around the country' fails to provide any limitation on the universe of possibilities of when or where or how such a protest might occur." 471 F.3d at 1209. Here, all but one of the named Plaintiffs live in Minneapolis, and all alleged they plan to continue protesting *in Minneapolis*. Compl. ¶¶ 10-16. Defendants seem to fault Plaintiffs for not being fortune-tellers who have the ability to predict when (not if) another horrible police-shooting will take place in Minneapolis, leading to massive peaceful protests. Taking Plaintiffs' allegations as true, the named Plaintiffs will peacefully protest again, and Defendants will continue their pattern and practice of retaliation and using excessive force against them. *See Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.") (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

---

[9] https://www.startribune.com/hundreds-arrested-as-protesters-march-onto-i-94/572976312/?refresh=true#11.

Plaintiffs and Class members request this Court "[e]njoin and prohibit Defendants from continuing its use of excessive force," compl. ¶ F, and to "[a]llow such other and further relief as the Court deems just and proper," compl. ¶ J.[10] Plaintiffs and Class members are not seeking such vague relief as requiring the Defendants to follow the law, as Defendants suggest. Defs.' Brf. at 34-35. Plaintiffs and the Classes allege that Defendants are continuing their use of excessive force pursuant to the polices, customs, and failures in training and supervision. These patterns and practices can be enjoined. *See Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 431 (1986) (affirming district court order "enjoining petitioners from discriminating against nonwhites, and enjoining the specific practices the court had found to be discriminatory").

---

[10] Defendants nonsensically argue, "Even if Plaintiffs had standing for injunctive relief the potential class members still do not have standing for declaratory or injunctive relief, and as the complaint solely seeks declaratory and injunctive relief for the class members, Plaintiffs class allegations should be dismissed on this basis alone." Defs.' Brf. at 35. This statement is incorrect. The Complaint does not solely seek declaratory and injunctive relief on behalf of the class members; it seeks such relief on behalf of the named Plaintiffs and the putative class members. And, so long as the named Plaintiffs have standing for the relief sought, so do the class members. *See, e.g.*, Fed. R. Civ. P. 23; *In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court; there is no further, separate 'class action standing' requirement.") (quoting 2 William B. Rubenstein, Newberg on Class Actions § 2:1 (5th ed. 2012)); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'") (citations omitted).

## V. This Is Not a Class Certification Motion Under Fed. R. Civ. P. 23 and Such a Motion Is Premature at This Stage

Rule 12(f) of the Federal Rules of Civil Procedure provides that the Court has discretion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Despite this broad discretion however, striking a party's pleadings is an extreme measure, and, as a result, we have previously held that "[m]otions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000). This is because "[t]he propriety of class action status can seldom be determined on the basis of the pleadings alone." *McCullen v. Union Pac. R.R. Co.*, No. 19-00347-CV-W-ODS, 2019 WL 3456815, at *3 (W.D. Mo. July 31, 2019) (quoting *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977)). Dismissal is not appropriate if "plaintiffs demonstrate that discovery is 'likely to produce persuasive information substantiating the class action allegations.'" *Id.* (quoting *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10-04175-CV-NKL, 2012 WL 4090347, at *2 (W.D. Mo. Sept. 17, 2012)). "[M]otions to dismiss class allegations should be met 'with a great deal of skepticism,' and dismissing class allegations prior to discovery and class certification proceedings is'rare' and 'generally disfavored.'" *Id.* (citations omitted).

### A. Commonality and Typicality Are Sufficiently Pleaded at This Stage and Discovery Is Needed Before Certification

Defendants argue that Plaintiffs do not assert any questions of law or fact that are common to the class and capable of classwide resolution and that, by the very nature of Plaintiffs' claims, they cannot meet the typicality requirement. Defs.' Brf. at 37, 40.

Defendants take too narrow of an interpretation of Plaintiffs' Complaint. First, Plaintiffs allege that the order to use force given during the last week of May was given as a blanket authorization by Defendants, *without* any analysis of the *Graham v. Conner* reasonableness factors. Compl. ¶ 176. When taken as true, as the Court must at this stage, this allegation defies any argument that an individualized inquiry need be undertaken because the officers on the scene and the person ordering the force did not make such an analysis. Second, because the evidence proving the identities of the John Doe Defendants alleged throughout the Complaint to have actually pulled the triggers is firmly in the hands of the Defendants, discovery is necessary before class certification decisions are rendered. *McCullen*, 2019 WL 3456815, at *3. Third, whether Defendant City of Minneapolis exhibited deliberate indifference to the rights of peaceful protestors asserting their First Amendment rights, compl. ¶ 192(b), is a question that will be resolved based on common, classwide evidence. Taking Plaintiffs allegations as true, individual MPD officers did not single out individual protestors for exercising their right to protest—Defendants had a retaliatory motive against all the peaceful protestors and were treated as a group. Fourth, obviously, the list of common questions in the Complaint is not exhaustive. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 n.10. (3d Cir. 2009) ("At minimum, only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2).") (internal quotations and citations omitted).

Regarding Defendants' hypothetical attacks on the typicality between the named Plaintiffs and the putative class members, Defendants only cite to cases at the class

certification stage and beyond, where substantial discovery has taken place. Defs.' Brf. at 40 (citing *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977) and *Elizabeth M. v. Montez,* 458 F.3d 779, 786-87 (8th Cir. 2006)). At this juncture, it is plausible that Plaintiffs' claims for which it will seek certification are typical of class members. Plaintiffs are not asserting a damages class, only a Rule 23(b)(2) class for declaratory and injunctive relief. Accordingly, a named Plaintiff who was the subject of excessive force resulting from a pattern and practice of excessive force will have typical claims of class members who were similarly victimized by the same pattern and practice.

Defendants highlight several possible issues that can easily be resolved with more precise defining of the class definitions, and perhaps by the creation of subclasses. Defs.' Brf. at 38-44. The class definitions alleged in the Complaint are not set in stone, and are subject to alteration by Plaintiffs or the Court *sua sponte*, wholly depending on what the evidence produced in discovery shows. *Gardner v. Hartford Life & Acc. Ins. Co.*, No. 2:08-CV-04030-NKL, 2008 WL 4279815, at *5 (W.D. Mo. Sept. 15, 2008) ("Normally, the parameters of the class are defined during the certification process, not at the pleading stage").

Finally, reading between the lines of Defendants' arguments, Defs.' Brf. at 39-40, the predominance inquiry is best analyzed on a full record. *See Anglin v. Edgewell Pers. Care Co.*, No. 4:18-CV-00639-NCC, 2018 WL 6434424, at *13 (E.D. Mo. Dec. 7, 2018) (expressing concern as to plaintiffs' ability to prove predominance for nationwide unjust enrichment claims but declining to strike the allegations at the motion to dismiss stage); *Huskey v. Colgate-Palmolive Co.*, No. 4:19-CV-02710-JAR, 2020 WL 5518312, at *8

(E.D. Mo. Sept. 14, 2020) ("[T]he Court notes that it has serious doubts as to whether Plaintiffs will be able to satisfy the predominance requirement. However, the Court finds that the decision as to the survival of Plaintiffs' class allegations should be made after allowing Plaintiffs to conduct discovery or on motion to the Court wherein they can provide additional briefing to explain whether the prerequisites of Rule 23 can be satisfied. Given the severity of striking class allegations at this early stage of the litigation, the Court—out of caution—will decline to strike the nationwide class allegations at this time.").

**B. Plaintiffs Properly Allege a Fed. R. Civ. P. 23(b)(2) Class**

Federal Rule of Civil Procedure 23(b)(2) states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As discussed above, Defendants' conduct alleged here to have violated Plaintiffs' and class members' rights can be evaluated without reference to individual circumstances because, taking the Plaintiffs' allegations as true, Defendants did not make individualized inquiries into what amount of force was necessary, and instead conducted this analysis on the group of protestors as a whole. Defendants again cite cases that were decided at class certification, making them easily distinguishable from the posture of this case. Defs.' Brf. at 44. For all of these reasons, Defendants' motion to dismiss or to strike the class allegations as insufficient on their face at the pleading stage is premature. *See Giesmann v. Am. Homepatient, Inc.*, No. 4:14CV1538 RLW, 2015 WL 3548803, at *4 (E.D. Mo. June 8, 2015); *Mitchell v.*

*Frank Bank, S.S.B.*, No. 05-cv-1320 (PAM/REL), 2006 WL 1132408, at *3 (D. Minn. Mar. 15, 2006). ("[I]t is premature to determine whether the class allegations have merit. [Plaintiff] has not been afforded time to complete discovery on class certification issues, and a more developed record is required before the Court can determine whether class certification is appropriate. Because [plaintiff] bears the burden of establishing the existence of the requirements for class action under Rule 23, he should have the opportunity to develop evidence on the certification elements.").

## VI. Alternatively, Plaintiffs Request Leave to Amend

Should the Court find any claim to be insufficiently pled, Plaintiffs respectfully request leave to amend. Leave to amend should be freely given "where justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff has yet to amend, and Courts in this District give leave to amend freely when no deficiencies have been previously identified. *In re Cattle Antitrust Litig.*, No. CV 19-1129 (JRT/HB), 2020 WL 5884676, at *8 (D. Minn. Sept. 29, 2020). Further, new facts about the use of excessive force in the peaceful protests described in the Complaint have become available. Moreover, as described in the Complaint, protestors have continued protesting against police brutality and racial injustice, with the police continuing to use excessive force and make mass arrests.

## CONCLUSION

For the foregoing reasons, Plaintiffs, on behalf of the putative classes, respectfully request that the Court deny Defendants' motion to dismiss in its entirety. If the Court

does grant Defendants' motion, Plaintiffs ask that leave to file an amended complaint be granted.

Dated: November 5, 2020

Respectfully submitted,

*s/ Joshua J. Rissman*
Daniel E. Gustafson (#202241)
Joshua J. Rissman (#391500)
Brittany Resch (#397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsonguek.com

***Attorneys for Plaintiffs***