## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jamal Samaha, Lauren Coleman, Jordan Meyer, Andy Delany, Mary Grace, Bonnie Brown, and Jonathan Mason, *on behalf of themselves and others similarly situated*, | Case No. 20-cv-01715 (SRN/DTS) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| The City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his individual and official capacity*; and John Does 1-100, *in their individual and official capacities*, | |
| Defendants. | |

Brittany N. Resch, Daniel E. Gustafson, and Joshua J. Rissman, Gustafson Gluek PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for Plaintiffs.

Heather Passe Robertson, Kristin R. Sarff, and Sharda R. Enslin, Minneapolis City Attorney's Office, 350 South Fifth Street, Suite 210, Minneapolis, MN 55415, for the City of Minneapolis and Medaria Arradondo.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Dismiss [Doc. No. 12] filed by the City of Minneapolis and Medaria Arradondo (collectively, "the City Defendants"). Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS in part** and **DENIES in part** the City Defendants' motion.

1

## I.    BACKGROUND

On May 25, 2020, George Floyd tragically died in the custody of the Minneapolis Police Department, triggering widespread demonstrations across the country. In the following days, protesters took to the streets of Minneapolis—and in some cases, there were riots, as looters and arsonists embedded themselves in groups of otherwise peaceful protesters. This litigation—and several similar lawsuits—arises from the state and municipal response to the challenging circumstances of the George Floyd protests.

Plaintiffs are several Minneapolis residents[1] who participated peacefully in the protests. They allege that members of the Minneapolis Police Department ("MPD") responded to the protests with excessive force, in violation of their constitutional rights. Namely, Plaintiffs allege that they, and other peaceful protesters like them, were subjected to tear gas, pepper spray, rubber bullets, and other "less-lethal munitions," without warning and despite the peaceful nature of their demonstrations. Accordingly, Plaintiffs seek relief under 42 U.S.C. § 1983 for violations of their First, Fourth, and Fourteenth Amendment rights. Plaintiffs also seek to represent two putative classes, comprising (1) all peaceful protesters subjected to excessive force by the MPD during the George Floyd protests, and (2) all persons who have been subjected to excessive force by the MPD. (Compl. [Doc. No. 1], at ¶ 190.) As a class, Plaintiffs seek declaratory and injunctive relief.

---

[1] One of the Plaintiffs, Bonnie Brown, formerly lived in Iowa and now resides in Mexico, but participated in the protests in Minneapolis on May 30 and May 31, 2020. (Compl. [Doc. No. 1], at ¶ 16.)

Defendants are the City of Minneapolis; Medaria Arradondo, in his individual capacity and in his capacity as the MPD's Chief of Police; and the John Doe officers involved in the use of force against Plaintiffs. The City Defendants move to dismiss the claims against them, arguing that the Complaint fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and that the claims against Chief Arradondo in his individual capacity are not well-pleaded. The City Defendants also argue that Plaintiffs lack standing to pursue prospective relief, both individually and as a class. Finally, the City Defendants contend that Plaintiffs have not satisfied the requirements of Federal Rule of Civil Procedure 23, and therefore seek to strike the class allegations from the Complaint.

Against this backdrop, the Court turns to the record pertinent to the City Defendants' motion. At this stage, the Court accepts the facts alleged by the Plaintiffs as true, views those allegations in the light most favorable to the Plaintiffs, and may generally consider only the facts alleged in the pleadings. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013); *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

### A.    May 26 and May 27, 2020 Protests

The day following George Floyd's death, protests began across Minneapolis. Plaintiffs allege that throughout the day on May 26, 2020, the protests were "peaceful and somber events." (Compl. ¶ 30.) But, beginning at 8:00 p.m., MPD officers allegedly "began using crowd-control devices, including pepper spray, mace, tear gas, rubber bullets, and flash bangs, firing indiscriminately into the crowd of protesters." (*Id.*) It is alleged that

MPD officers additionally "spray[ed] tear gas on peaceful protesters who were singing and holding signs." (*Id.* ¶ 31.)

Plaintiffs allege that, as the protests continued, so did the MPD's use of force. On May 27, "hundreds of protesters and people peacefully marched" from Cup Foods in Minneapolis to the MPD's Third Precinct building. (*Id.* ¶ 33.) It is alleged that "the vast majority of protesters were peacefully demonstrating when [MPD] officers began arbitrarily spraying mace, pepper spray, tear gas, and rubber bullets at the people gathered." (*Id.*)

**B.    May 28, 2020 Protests**

On May 28, Plaintiff Lauren Coleman participated in a protest that began at Government Plaza in Minneapolis and moved toward Hennepin Avenue. (*Id.* ¶ 38.) It is alleged that when the group paused at Hennepin Avenue and Fifth Street, a group of three MPD vehicles began to drive through the crowd. (*Id.* ¶¶ 39-40.) Although the first two vehicles were allegedly able to pass through the crowd unobstructed, an officer in the third vehicle sprayed pepper spray out the window of the moving vehicle. (*Id.* ¶¶ 40-43.) In addition, the officers allegedly deployed tear gas into the crowd. (*Id.* ¶ 42.) Coleman and other protesters were hit by the pepper spray, and fled. (*Id.* ¶ 44.)

That evening, Plaintiff Jonathan Mason joined a protest near the Mayo Clinic building on Hennepin Avenue and Sixth Street. (*Id.* ¶ 47.) As Minnesota State Patrol officers stood in formation blocking the roadway, Mason "verbally engaged" one of the officers. (*Id.* ¶¶ 48, 51.) It is alleged that the State Patrol officer acknowledged Mason, and that no officer gave Mason a warning to back up or otherwise gave "the slightest indication

Mason presented an immediate threat." (*Id.* ¶ 52.) Nonetheless, an MPD officer allegedly approached Mason and sprayed him with pepper spray. (*Id.* ¶ 53.)

### C.    May 29, 2020 Protests

Beginning on May 29, 2020, Governor Tim Walz imposed a curfew for the cities of Minneapolis and St. Paul. (*Id.* ¶ 56.) State officials also activated a Multi-Agency Command Center ("MACC"), a temporary coordinating agency under the Minnesota Department of Public Safety. (*Id.* ¶ 57.) It is alleged that the MACC "served as a unified command of federal, state, and local law enforcement and public safety agencies to support the state's response to any unrest that developed following the death of George Floyd," and that representatives of the MPD, along with numerous other state and local law enforcement entities, participated in the MACC. (*Id.*) As the protests continued, the MACC coordinated the law enforcement response. (*Id.* ¶ 58.)

Around 8:00 p.m., protesters kneeled in front of the Third Precinct building. (*Id.* ¶ 60.) It is alleged that the protesters were peaceful, did not intend to be violent, and intended only to display civil disobedience to the curfew. (*Id.*) Before the curfew took effect, MPD officers allegedly fired tear gas canisters into the crowd of protesters. (*Id.*)

### D.    May 30, 2020 Protests

On May 30, 2020, Governor Tim Walz again imposed an 8:00 p.m. curfew. (*Id.* ¶ 61.) The curfew allegedly permitted people to stand in their front and back yards after 8:00 p.m. (*Id.*) Nonetheless, it is alleged that shortly after the curfew started, MPD officers used "tear gas and other less-than-lethal measures on anyone and everyone that was out," including journalists, peaceful protesters, and people standing on their porches. (*Id.* ¶¶ 64-

65.) Plaintiffs allege such uses of force in several areas in the vicinity of Nicollet Avenue in Minneapolis. (*Id.* ¶¶ 66-69.) In one incident, MPD officers allegedly fired rubber bullets at a news crew "standing nowhere near protesters" in a parking lot. (*Id.* ¶ 69.)

Plaintiff Bonnie Brown alleges that she joined a group of protesters at the intersection of 31st Street and Nicollet Avenue, near the Fifth Precinct building. (*Id.* ¶ 70.) Plaintiffs Jordan Mayer and Jamal Samaha were also present near the Fifth Precinct. (*Id.* ¶¶ 75, 82.) It is alleged that the group sat or knelt peacefully while listening to speeches and group prayers, and that children were present. (*Id.* ¶¶ 71, 76.) MPD officers and National Guard soldiers allegedly approached the group and, without warning or orders to disperse, fired tear gas, rubber bullets, and flashbangs into the crowd. (*Id.* ¶¶ 72, 80.) According to Samaha, MPD officers approached the group on all sides to disperse them toward the northeast, and fired tear gas and flashbangs into the middle of the crowd. (*Id.* ¶ 85.) Samaha alleges that he witnessed a four- or five-year-old child be tear gassed. (*Id.*) Samaha also alleges that he witnessed MPD officers in their squad cars attempt "to run people over, even people on the sidewalks, to arrest them." (*Id.* ¶ 86.)

### E. May 31, 2020 Protests

On May 31, 2020, Governor Walz again imposed an 8:00 p.m. curfew. (*Id.* ¶ 88.) State officials also planned to close roads, including Interstate 35W and Interstate 94, at 7:00 p.m. (*Id.* ¶ 89.) Plaintiffs Andy Delany, Samaha, Brown, and Meyer joined "thousands" of protesters marching through Minneapolis and onto the Interstate 35W bridge. (*Id.* ¶ 90.) Although initially scheduled for 7:00 p.m., state officials began the road closures at 5:00 p.m. (*Id.* ¶ 89.) Nonetheless, at 5:46 p.m. a large tanker truck remained on

the northbound lane of Interstate 35W, and drove into the crowd of protesters at approximately 70 mph. (*Id.* ¶¶ 92, 100.) As protesters fled from the truck, MPD vehicles allegedly entered Interstate 35W from "every nearby exit and entrance ramp," and at least two MPD vehicles "slowed down to spray people leaving the protest with tear gas." (*Id.* ¶ 94.) Samaha alleges that he also saw officers spray mace or pepper spray at protesters who were attempting to leave the protest. (*Id.* ¶ 104.) It is alleged that, as the protesters continued to disperse, MPD officers fired tear gas and rubber bullets at them. (*Id.* ¶¶ 96, 106.)

Meanwhile, several protesters attempted to protect the driver of the vehicle from others in the crowd and deliver the driver to the arriving police officers. (*Id.* ¶ 115.) Meyer alleges that MPD officers pepper sprayed the protesters who had attempted to deliver the driver to them. (*Id.*)

After fleeing from the tanker truck, Grace jumped a nearby fence to get off the highway. (*Id.* ¶ 122.) She then assisted others in climbing over the fence. (*Id.* ¶ 123.) Grace alleges that MPD officers arrived on the highway side of the fence, and though they gave no commands to the protesters, began pulling people off the fence. (*Id.*) It is alleged that an MPD officer pulled one individual off the fence, and then sprayed that individual with mace as he laid on the ground in the fetal position. (*Id.* ¶ 125.) As Grace tried to explain that the individual had been escaping the tanker, the officer allegedly sprayed Grace, through the fence, with mace. (*Id.* ¶ 126.) The officer then ceased spraying the individual, and allowed him to climb over the fence. (*Id.* ¶ 127.) It is alleged that neither Grace nor the

individual presented any threat to the officer's safety, were not acting unlawfully, and were not resisting an arrest. (*Id.* ¶¶ 126-27.)

Brown similarly fled from the truck, and joined a group of approximately 200 protesters on Washington Avenue. (*Id.* ¶¶ 154-55.) It is alleged that officers sprayed the group with tear gas, and as they ran to the east to escape the gas, officers sprayed them again. (*Id.* ¶¶ 156, 159.) The officers also fired rubber bullets into the crowd, and Brown alleges that she witnessed a woman—also fleeing—fall unconscious after being struck by a rubber bullet. (*Id.* ¶¶ 157-58.) Brown and several others in her group eventually decided to sit down, and were surrounded by MPD officers and arrested. (*Id.* ¶¶ 160, 162.)

Elsewhere, Delany joined a group of protesters at Bobby and Steve's gas station, near Interstate 35W. (*Id.* ¶ 130.) Delany alleges that the group, small in number, had been peacefully chanting and holding signs. (*Id.* ¶ 132.) It is alleged that MPD officers pepper sprayed the group, and when the protesters fled, another group of officers closed off their escape. (*Id.* ¶¶ 132-33.) As the protesters began jumping over fences to escape the police, MPD officers allegedly fired rubber bullets at them. (*Id.* ¶ 134.) Ultimately, MPD officers encircled Delany and those near him in a parking lot. (*Id.* ¶ 137.) Delany alleges that he saw an MPD officer approach a parked car in the parking lot, open the door, "shov[e] his gun inside," and throw the protester in the car to the ground. (*Id.*) Another officer allegedly sprayed pepper spray into a car filled with protesters. (*Id.* ¶ 149.) Delany was allegedly pepper sprayed and tear gassed by MPD officers several times as the officers attempted to corral the group. (*Id.* ¶¶ 141-43.) As MPD officers completed their encirclement, the protesters sat down. (*Id.* ¶ 145.) An officer then announced that the everyone in the group

was under arrest, and officers began loading them into a paddy wagon. (*Id.* ¶¶ 146-47.) When seated in the wagon, Delany allegedly asked several MPD officers for help treating his eyes, which burned from the pepper spray, and the officers laughed. (*Id.* ¶ 148.)

## II.   DISCUSSION

### A.   Standard of Review

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings," as well as statements of counsel at oral argument that raise new facts not alleged in the pleadings. *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

### B.    The City Defendants' Motion to Dismiss

The City Defendants argue that the Complaint fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and that the claims against Chief Arradondo in his individual capacity are not well-pleaded. The City Defendants also challenge Plaintiffs' standing to seek prospective relief, and seek to strike Plaintiffs' class allegations. The Court will begin with Plaintiffs' *Monell* claim.

### 1.    *Monell* Claim Against the City Defendants

Under *Monell*, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Rather, a municipality may be liable for a police officer's constitutional violation only if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

The gravamen of Plaintiffs' claim is that an unofficial custom was the moving force behind MPD officers' allegedly unconstitutional use of force against them.[2] "To trigger municipal liability based on [an] unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law." *Id.* at 986 (citing *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998)). In order to establish a *Monell* custom claim, the plaintiff must show:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (quotation omitted). Because the City Defendants do not appear to dispute that Plaintiffs have plausibly alleged that their injuries were caused by the asserted custom, the Court need only examine the first two elements.

### a.      Continuing, Widespread, and Persistent Pattern

*Monell* liability for an unofficial custom requires that the custom "be demonstrated by a continuing, widespread, and persistent pattern of unconstitutional misconduct."

---

[2] Plaintiffs also assert that *Monell* liability attaches under the official municipal policy and deliberately indifferent failure to train or supervise theories. Because the Court ultimately concludes that the Complaint states a *Monell* claim under an unofficial custom theory, the Court declines to address Plaintiffs' alternative theories at this time.

*Bolderson*, 840 F.3d at 986 (citing *Ware*, 150 F.3d at 880). "Although an unconstitutional custom claim cannot be predicated on a single act, the Eighth Circuit has not determined whether some other, minimum number of incidents is required as evidence of custom." *Tirado v. City of Minneapolis*, No. 20-cv-1338 (JRT/ECW), 2021 WL 679261, at *5 (D. Minn. Feb. 22, 2021) (citations omitted). In addition to the number of incidents of misconduct, the Court must also "consider the timeframe or duration of the incidents when assessing whether the pattern was widespread." *Id.* at *6.

Plaintiffs allege that the City Defendants have a policy, practice, and custom of using objectively unreasonable excessive force when policing protests and using less-lethal force, without warning and without time for disbursement, against citizens who are not resisting arrest and are exercising First Amendment rights. (*See* Compl. ¶ 204.) To evidence the alleged custom, Plaintiffs point to their experiences during the George Floyd protests from May 26 to May 31, 2020.[3] Within this timeframe, Plaintiffs allege that while they and others protested peacefully, MPD officers deployed tear gas and less-lethal munitions against them and thousands of other protesters without issuing warnings, orders to disperse, or giving protesters time to disperse. Plaintiffs allege incidents of excessive force against peaceful protesters on each day of the protests, by numerous MPD officers,

---

[3] Plaintiffs also point to other incidents of force and statistical data regarding excessive force complaints against MPD officers dating back to the 1980s. (*See id.* ¶¶ 182-87.) The City Defendants argue that the Court should not consider these prior incidents and statistical data. But the Court ultimately concludes that Plaintiffs' allegations regarding the George Floyd protests are sufficient to plausibly allege a *Monell* custom claim, and therefore the Court need not consider Plaintiffs' allegations regarding prior incidents of misconduct for purposes of this motion.

and at several locations across the city. (*See id.* ¶¶ 31, 33, 40-43, 53, 60, 64-69, 72, 80, 86, 94, 96, 106, 115, 125, 132-34, 149, 157-58.) The Complaint includes allegations that MPD officers directed chemical irritants and less-lethal munitions even against protesters who were already dispersing, and protesters who could not disperse because their escape had been blocked by law enforcement officers. (*See id.* ¶¶ 85, 96, 106, 122-27, 132-34, 159-62.)

The City Defendants characterize Plaintiffs' allegations as ten instances of misconduct, and argue that "[t]en occasions of challenged conduct during this period of unprecedented civil unrest cannot fairly be described as evidencing a practice that is 'persistent and widespread.'" (Mem. in Supp. of Mot. to Dismiss [Doc. No. 14], at 23.) It is true that the City of Minneapolis experienced unprecedented civil unrest, including dangerous incidents of arson and vandalism, following the death of George Floyd. But the crux of the Complaint is that MPD officers systematically employed unconstitutionally excessive force against even those protesters who exercised their First Amendment rights peacefully. Plaintiffs allege several incidents of such force against numerous protesters, on each day of the protests in May 2020, and in different places across the city, in support of their claim that MPD officers acted pursuant to an unofficial custom. Certainly, courts have dismissed *Monell* claims based on more occasions of misconduct than alleged here, including where the misconduct was spread across a greater time period, at summary judgment. *See Tirado*, 2021 WL 679261, at *6 (examining cases). But at the pleading stage, "[e]ven if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the 'complaint must allege facts which would support the

existence of an unconstitutional policy or custom.'" *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015).

The Court finds that the Complaint alleges facts which would support the existence of an unconstitutional policy or custom. Plaintiffs allege similar misconduct occurring on different days and in different places, by many different MPD officers, during the George Floyd protests. In *Tirado*, this Court recently found that a journalist plausibly alleged a *Monell* claim against the City Defendants, where the journalist alleged only ten instances of misconduct during the George Floyd protests. *Tirado*, 2021 WL 679261, at *6–7. As in *Tirado*, the Court finds that Plaintiffs' allegations of excessive force during the George Floyd protests plausibly allege a continuing, widespread, and persistent pattern of unconstitutionally excessive force exercised against protesters. Although courts have dismissed *Monell* claims alleging more incidents of misconduct than Plaintiffs allege here *at summary judgment*, at this stage the number of incidents alleged "supports the existence of an unconstitutional policy or custom." *Sagehorn*, 122 F. Supp. 3d at 867. And while the alleged incidents of misconduct during the George Floyd protests are condensed into a relatively short period in May 2020,[4] the facts alleged permit the reasonable inference that the time period was sufficiently long for the City Defendants to take notice of the MPD officers' alleged misconduct and change course. *See Tirado*, 2021 WL 679261, at *7 (noting that a custom is temporally persistent when the alleged time period is sufficiently

---

[4] The Court again notes that Plaintiffs claim the MPD's custom of using excessive force extends back into the 1980s. But the Court need only consider Plaintiffs' allegations related to the George Floyd protests to dispose of the present motion.

long to "permit notice of the unlawful practice," and finding that the plaintiff plausibly alleged that the City Defendants had notice of MPD officers' conduct during the George Floyd protests).

### b.   Deliberate Indifference or Tacit Authorization

In order to establish *Monell* liability, a plaintiff must also prove that the municipality showed deliberate indifference to or tacitly authorized police officers' misconduct after having notice of that misconduct. *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). "'Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability[,]' but the complaint must also allege that the defendant 'made a deliberate choice' to ignore alleged violations." *Tirado*, 2021 WL 679261, at *7 (first quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013), then quoting *Johnson*, 725 F.3d at 829).

The Court finds that Plaintiffs have plausibly alleged that the City Defendants had notice of MPD officers' alleged use of chemical irritants and less-lethal munitions on peaceful protesters, including those who were already dispersing, during the George Floyd protests. To be sure, the Complaint does not include specific allegations regarding the City Defendants' command structure and mechanisms for transmitting information regarding the protests to municipal policymakers. *Cf. id.* at *8 (noting that the plaintiff "explains how the City allegedly became aware of" the alleged incidents of misconduct "through broad reporting by news outlets, the City's own social media monitoring efforts, and direct outreach by media"). Yet the Complaint does allege that the protests—and MPD officers' crowd control tactics during the protests—were widely reported. (*See generally* Compl.

(incorporating dozens of citations to news articles and videos of the protests).) Plaintiffs also allege that Minneapolis Mayor Jacob Frey posted on social media regarding decisions made by the MACC, evidencing the mayor's awareness of the coordinated law enforcement response during the protests. (*Id.* ¶ 59.) And the City Defendants' own characterization of the protests as "a period of massive and dangerous civil unrest" undercuts the claim that municipal policymakers did not have notice of the protests and the MPD's response to it. (Mem. in Supp. of Mot. to Dismiss at 28.) Although the Complaint's factual allegations regarding the City Defendants' alleged deliberate choice to ignore the MPD officers' conduct are comparatively sparse, the Court declines, at this early stage, to dismiss this lawsuit on that basis. *See Tirado*, 2021 WL 679261, at *8 ("Although Tirado does not allege specific facts about the City's deliberation or decision to ignore such incidents, this is likely too much to ask at the pleading stage, when all that is required is a 'possible custom.'" (citing *Sagehorn*, 122 F. Supp. 3d at 867)).

The Court acknowledges that the City Defendants faced unprecedented unrest during the George Floyd protests, and that after the protests the City of Minneapolis and the MPD have attempted to reform the MPD's crowd control policies. (*See* Compl. ¶ 175 (noting amendments to MPD policies).) Nonetheless, the Court finds that the Complaint plausibly alleges that an unofficial custom regarding the use of unconstitutional force against peaceful protesters existed at the time of the George Floyd protests, and that the custom was either tacitly authorized by municipal policymakers or policymakers were deliberately indifferent to it. Accordingly, the Court denies the City Defendants' Motion to Dismiss with respect to Plaintiffs' *Monell* claim.

16

### 2.    Individual Capacity Claims Against Chief Arradondo

Next, the Court turns to the City Defendants' motion to dismiss Plaintiffs' claims against Chief Arradondo in his individual capacity. Plaintiffs argue that Chief Arradondo directly authorized the use of force against protesters, and that, as the supervisor of the MPD officers who allegedly violated Plaintiffs' constitutional rights, Chief Arradondo bears individual liability for the failure to supervise and train those officers. A supervisor may be individually liable under § 1983 "if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citing *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994)). A plaintiff asserting a supervisory liability claim "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts," which "requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* (citations omitted). Because § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights," Plaintiffs "must allege specific facts" regarding Chief Arradondo's "personal involvement in, or direct responsibility for," the deprivation of their rights. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).

The Court finds that Plaintiffs have not plausibly alleged that Chief Arradondo directly authorized the use of force against them. To the contrary, Plaintiffs allege that the state-led MACC coordinated the law enforcement response to the protests. (Compl. ¶ 57.)

Although the MPD was one of the agencies represented in the MACC, Plaintiffs indicate that officials from the Minnesota National Guard and Department of Public Safety controlled the MACC's decision-making. (*See id.* ¶ 59.) Moreover, Plaintiffs attribute the MPD's blanket authorization for the use of force against the protesters to Chief Arradondo, but allege that "[o]n information and belief, the authorization for use of force was given as a blanket authorization *by the on-scene incident commander(s)*," consistent with the MPD's policies as of May 27, 2020. (*Id.* ¶¶ 174, 176 (emphasis added).) It is alleged that the on-scene incident commander is generally "the ranking officer or supervisor at the scene." (*Id.* ¶ 177.) As alleged, the MPD's policies did not require direct authorization for the use of force from the Chief of Police until an amendment made in June 2020. (*Id.* ¶ 175.) Thus, Plaintiffs have not plausibly alleged that Chief Arradondo directly authorized the use of force against them.

Further, the Court finds that Plaintiffs have not plausibly alleged facts supporting a supervisory liability claim against Chief Arradondo. Plaintiffs have not alleged any facts specifically related to Chief Arradondo's personal involvement in the John Doe officers' supervision and training.[5] Plaintiffs do not allege, for example, that Chief Arradondo

---

[5] Plaintiffs assert only that "[t]he Complaint plausibly alleges Defendant Arradondo directed, coordinated, and was aware of his officers' use of less lethals against Plaintiffs and class members," and that "[t]his awareness demonstrates a failure to supervise and train these officers." (*See* Mem. in Opp'n to Mot. to Dismiss [Doc. No. 20], at 11.) In the Court's view, the mere allegation that Chief Arradondo was aware of the officers' misconduct, without more, does not permit the inference that Chief Arradondo failed to train or supervise the officers with deliberate indifference, for purposes of individual liability under § 1983.

personally trained or supervised any of the John Doe defendants. In essence, Plaintiffs'
claim is that because Arradondo is the Chief of Police, he bears supervisory responsibility
for all officers in the MPD, and may therefore be held individually liable for constitutional
violations committed by any MPD officer. In the Court's view, this theory stretches § 1983
supervisory liability too far. *Cf. Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987)
(noting that "a warden's general responsibility for supervising the operations of a prison is
insufficient to establish personal involvement" for purposes of an individual capacity
§ 1983 claim).

Because Plaintiffs have not plausibly alleged that Chief Arradondo directly
authorized the use of force against them or was personally involved in the supervision and
training of the MPD officers allegedly involved in the violation of Plaintiffs' rights, the
Court finds that the Complaint does not state a claim against Chief Arradondo in his
individual capacity and dismisses this claim without prejudice.

### 3.  Standing

The City Defendants also contend that Plaintiffs and the putative class-members do
not have standing to seek prospective relief. Where a defendant challenges the Court's
subject-matter jurisdiction on the face of the complaint, the Court must "accept as true all
factual allegations in the complaint, giving no effect to conclusory allegations of law," and
determine whether the plaintiff's alleged facts "affirmatively and plausibly suggest" that
jurisdiction exists. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).
The Court's review is limited to the face of the pleadings. *Branson Label, Inc. v. City of
Branson*, 793 F.3d 910, 914 (8th Cir. 2015).

19

In order to establish standing, Plaintiffs must plausibly allege that they have suffered an injury in fact, that there is a causal connection between their injury and the City Defendants' conduct, and that their injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs seek prospective declaratory and injunctive relief "requiring Defendants to conform their future conduct to federal law based on what they have done in the past." (Mem. in Opp'n to Mot. to Dismiss at 24.) The City Defendants argue that Plaintiffs have not demonstrated a sufficient likelihood of future injury to furnish standing to seek such relief.

The Court finds that Plaintiffs have plausibly alleged a likelihood of future injury caused by the City Defendants. As explained above, Plaintiffs have plausibly alleged that MPD officers violated their constitutional rights during the George Floyd protests, pursuant to an unofficial custom of using excessive force against peaceful protesters. Further, each of the Plaintiffs avers that they will peacefully protest in Minneapolis again in the future. (Compl. ¶¶ 10-16.) Because Plaintiffs have plausibly alleged that the City Defendants have a pattern and practice of utilizing excessive force against peaceful protesters, and that Plaintiffs will peacefully protest in Minneapolis in the future, Plaintiffs have adequately pleaded standing to bring claims for declaratory and injunctive relief. The City Defendants analogize to *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006), where the court found that political protesters lacked standing to challenge the Secret Service's policies and practices concerning protests at presidential appearances. There, the court reasoned that it was "entirely conjectural" that the president would return to speak at the same venue, and that it was not "even remotely permissible to presume future injury from Plaintiffs' intention to

protest 'at other locations around the country,'" where the plaintiffs would allegedly be again confronted with the same allegedly unconstitutional Secret Service policies and practices. *Id.* at 1209.

By contrast, Plaintiffs specifically allege that they will again protest peacefully in Minneapolis, where they will again be subject to the MPD's alleged policies and customs authorizing excessive force against peaceful protesters. Although Plaintiffs have not pleaded *when* they will again participate in protests in Minneapolis, Plaintiffs are not required to divine the date when the next controversy will spark widespread outrage in this community. The Court finds that Plaintiffs have standing.[6]

### 4.    Class Allegations

Finally, the City Defendants ask the Court to strike Plaintiffs' class allegations. They argue that Plaintiffs' claims fail the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a), and that Plaintiffs' proposed classes do not meet the requirements of Rule 23(b)(2). But "[t]he propriety of class action status can seldom be determined on the basis of the pleadings alone. The District Court must have before it 'sufficient material . . . to determine the nature of the allegations, and rule on compliance with the Rule's requirements . . . .'" *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th

---

[6] Because the named Plaintiffs have standing to seek prospective relief, so too do the putative class-members. *In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court; there is no further, separate 'class action standing' requirement." (quoting 2 William B. Rubenstein, Newberg on Class Actions § 2:1 (5th ed. 2012))).

Cir. 1977) (citations omitted); *see also Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10-04175-CV-C-NKL, 2012 WL 4090347, at \*2 (W.D. Mo. Sept. 17, 2012) ("[T]he weight of authority indicates that courts should meet motions to dismiss class allegations at the 12(b)(6) stage with a great deal of skepticism." (collecting citations)). This is not a class certification motion, and Plaintiffs have not had the opportunity to discover and present evidence pertinent to the commonality and typicality of the proposed class-members' claims. *Cf. Walker*, 563 F.2d at 921 ("Where . . . the pleadings themselves do not conclusively show whether the Rule 23 requirements are met, the parties must be afforded the opportunity to discover and present documentary evidence on the issue."). The Court finds that, at this stage, Plaintiffs have plausibly alleged that their proposed class-members' claims share common issues of law and fact, that Plaintiffs' claims are typical of the class-members', and that the City Defendants have "acted . . . on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(a)(2–3), (b)(2).

Accordingly, the Court denies the City Defendants' Motion to Dismiss with respect to Plaintiffs' class allegations.

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that the City Defendants' Motion to Dismiss [Doc. No. 12] is **GRANTED in part** and **DENIED in part**, and Plaintiffs' claims against Minneapolis Chief of Police Medaria Arradondo in his individual capacity are dismissed **without prejudice**.

**IT IS SO ORDERED.**


Dated: March 11, 2021                              s/Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge