## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jamal Samaha, Lauren Coleman, Jordan Meyer, Andy Delany, Mary Grace, Bonnie Brown, and Jonathan Mason, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>The City of Minneapolis; Minneapolis Police Lieutenant Robert Kroll, in his individual capacity; Major Joseph Dwyer, in his individual capacity; Officer Samantha Belcourt, in her individual capacity; Officer George Peltz, in his individual capacity; Officer Sergio Villegas, in his individual capacity; Officer Toua Yang, in his individual capacity; and John Does 1-100, in their official and individual capacities,<br><br>          Defendants. | Court File No. 20-cv-01715-KMM-DTS<br><br><br><br>**SECOND AMENDED COMPLAINT** |
| Nekima Levy Armstrong, Marques Armstrong, Terry Hempfling, Rachel Clark, and Max Fraden, on behalf of themselves and other similarly situated individuals,<br><br>          Plaintiffs,<br><br>v.<br><br>City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, in his official capacity; Minneapolis Police Lieutenant Robert Kroll, in his individual and official capacity; and John Does 1-2, in their official and individual capacities,<br><br>          Defendants. | Court File No. 20-cv-01645-KMM-DTS |

## INTRODUCTION

1.      This is a class action for injunctive and declaratory relief to declare as unlawful, and put an end to, the systematic use of excessive force by the Minneapolis Police Department ("MPD") against peaceful protestors and against the citizens of Minneapolis.  This is also an action for damages to compensate Plaintiffs for the unreasonable violation of their constitutional rights.

2.      On May 25, 2020, George Floyd was murdered by Minneapolis Police Department officers. Large-scale demonstrations against racism and racialized police violence began after Mr. George Floyd's death in Minneapolis, as protestors of all ages and races expressed their outrage and called for justice for George Floyd, and for all of the other black people, indigenous people, and people of color senselessly injured and killed by police in Minneapolis and in the United States. Protestors called for changes to address systemic racism and reshape the way matters of public safety are addressed in Minneapolis, and in this country.

3.      Following Mr. Floyd's death, a week of mostly peaceful protests took place around Minneapolis. However, these peaceful demonstrations were often met with unreasonable and excessive shows of force from MPD and other law enforcement. Minneapolis Police Department officers, including John Doe Defendants, utilized "less-lethal" weapons against protestors, including rubber bullets, pepper spray and tear gas. Minneapolis Police Department officers, including John Doe Defendants, used these weapons without restraint or justification, often spraying or gassing scores of peaceful protestors, or firing rubber bullets randomly into crowds of innocent people.

2

4.      MPD Policy states that the "Sanctity of life and the protection of the public shall be the cornerstones of the MPD's use of force policy." 5-301 MPD Use of Force Police – Purpose.

5.      "Based on the Fourth Amendment's "reasonableness" standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used. The force used shall be consistent with current MPD training." 5-301.01 MPD Use of Force Policy – Policy.

6.      Unfortunately, as repeatedly demonstrated through MPD officers' conduct in the days following Mr. Floyd's death, the MPD has not upheld the sanctity of life and have failed to protect the public—particularly including people of color—by continuously using force that is excessive, unreasonable, and inconsistent with MPD training and common sense.

7.      In one such incident, peaceful protestors marching down the I-35W bridge were forced to run for cover when a tanker drove into the crowd at high speeds. When MPD and other law enforcement responded to the event, officers did not look to ensure whether protestors had been injured. Instead, officers saw to the safety of the driver of the tanker, and then immediately began using tactics such as spraying pepper spray, dispensing tear gas, and shooting rubber bullets, despite the fact that the protestors were already dispersing. In other blatant displays of excessive force, captured on video, MPD

officers can be seen spraying tear gas and pepper spray indiscriminately out of their squad car windows while driving through peaceful protests.[1]

8.      The shocking events of this week in Minneapolis are not surprising, given MPD's pattern and practice of using excessive force against those it is meant to serve and protect in the years prior to Mr. Floyd's death. Between 2011 and 2013 alone, the MPD was named a defendant in 53 lawsuits alleging use of excessive force.[2]

9.      Plaintiffs bring this class action on behalf of themselves and others similarly situated and allege that Defendants' conduct violated their First Amendment rights to freedom of speech and assembly, their Fourth Amendment rights to be free from excessive force and false arrest, and their Fourteenth Amendment right not to be subject to official governmental policies which violate their constitutional rights.

## PARTIES

10.     Plaintiff Andy Delany lives in Minnesota. Delany was peacefully protesting on May 31, 2020, on Washington Avenue near the I-35W bridge when he was, without warning, unreasonably pepper sprayed twice by officers without justification. The unlawful pepper spraying by MPD officers caused Delany pain and suffering, mental

---

[1]      Now That's Crazy, *Minneapolis Cops pepper spraying people out of moving squad cars*, YOUTUBE (June 6, 2020) https://www.youtube.com/watch?v=DSg04ICitEA; Terrence Daniels, *Minneapolis police caught spraying people with pepper spray for no reason out their car window*, YOUTUBE (May 28, 2020) https://www.youtube.com/watch?v=au6KV-k4sIQ.
[2]      *Minneapolis police face lawsuits alleging misconduct*, STAR TRIBUNE (August 17, 2013) https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/?c=y&page=1.

anguish, and chilled Delany's First Amendment right to free speech and peaceful assembly.  Delany is likely to participate in peaceful protests in the future in Minneapolis.

11.     Plaintiff Jordan Meyer lives in Minnesota. Meyer was peacefully protesting on May 30, 2020, near the 5th precinct, and May 31, 2020, on the I-35W bridge when he was unreasonably tear-gassed without justification. The multiple incidents of being unlawfully tear-gassed by MPD officers caused Meyer pain and suffering, mental anguish, and chilled Meyer's First Amendment right to free speech and peaceful assembly.  Meyer is likely to participate in peaceful protests in the future in Minneapolis.

12.     Plaintiff Lauren Coleman lives in Minneapolis, Minnesota. Coleman was peacefully protesting on May 28th, 2020, in downtown Minneapolis. Coleman was unreasonably and without justification peppered sprayed when three MPD squad cars drove through the crowd of protestors, dispensing pepper spray indiscriminately out of their open squad car windows.  MPD officers' spraying of pepper spray caused Coleman pain and suffering, mental anguish, and chilled Coleman's First Amendment right to free speech and peaceful assembly.  Coleman is likely to participate in peaceful protests in the future in Minneapolis.

13.     Plaintiff Jamal Samaha was residing in Minneapolis, Minnesota in May due to COVID-19. He was peacefully protesting on May 31, 2020, on the I-35W bridge when he was, without warning, pepper sprayed three times by officers. The multiple incidents of being unlawfully tear-gassed by MPD officers caused Samaha pain and suffering, mental anguish, and chilled Samaha's First Amendment right to free speech and peaceful

assembly.  Samaha is likely to participate in peaceful protests in the future in Minneapolis.

14.     Plaintiff Mary Grace lives in Minneapolis, Minnesota. She was peacefully protesting on May 31, 2020, on the I-35W bridge when she was, without warning, pepper sprayed by officers. MPD officers' spraying of pepper spray caused Grace pain and suffering, mental anguish, and chilled Grace's First Amendment right to free speech and peaceful assembly.  Grace is likely to participate in peaceful protests in the future in Minneapolis.

15.     Plaintiff Jonathan Mason lives in Minneapolis, Minnesota. He was peacefully protesting in Downtown Minneapolis on May 28, 2020, when without warning or provocation, he was pepper sprayed by a Minneapolis Police Officer. MPD officers' spraying of pepper spray caused Mason pain and suffering, mental anguish, and chilled Mason's First Amendment right to free speech and peaceful assembly. Mason is likely to participate in peaceful protests in the future in Minneapolis.

16.     Plaintiff Bonnie Brown is U.S. Citizen who formerly resided in Iowa and now resides in Rosarito, Mexico. Brown was peacefully protesting on May 30, 2020, near the 5th precinct, and May 31, 2020, on the I-35W bridge when she was unreasonably tear-gassed without justification. The multiple incidents of being unlawfully tear-gassed by MPD officers caused Brown pain and suffering, mental anguish, and chilled Brown's First Amendment right to free speech and peaceful assembly.  Brown is likely to participate in peaceful protests in the future in Minneapolis.

6

17.     Defendant City of Minneapolis is a municipality in Hennepin County in the State of Minnesota with its principal place of business located at 350 S 5th St, Minneapolis, MN 55415. At all times relevant, this Defendant was authorized to and did operate and maintain the Minneapolis Police Department, and acted by and through its duly authorized agents, employees, and/or assigns, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the City of Minneapolis. Defendant City of Minneapolis is sued directly and under the principles of respondeat superior and vicarious liability and under a *Monell* theory of liability.

18.     Defendant Robert Kroll is a resident of Minnesota. Kroll served as a Lieutenant in the Minneapolis Police Department and was the president of the Minneapolis Police Federation between May 25, 2020 and May 31, 2020.  At all times relevant, Kroll's actions violated Plaintiffs' rights as alleged herein. At all times relevant, Kroll was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the City of Minneapolis. Kroll is sued in his individual capacity.

19.     Defendant Joseph Dwyer is a resident of Minnesota. Dwyer currently serves as a Major in the Minnesota State Patrol. On information and belief, Dwyer held the rank of Captain during the protests and demonstrations taking place between May 25, 2020 and May 31, 2020, and was the commander of the Mobile Response Team. At all times relevant, Dwyer's actions violated Plaintiffs' rights as alleged herein. At all times relevant, Dwyer was acting under color of state and federal law, within the scope of his

official duties and in accordance with the customs, policies, and practices of the

Minnesota State Patrol. Dwyer is sued in his individual capacity.

20.     Defendant Samantha Belcourt is a resident of Minnesota. Belcourt serves as

an officer in the Minneapolis Police Department, and on information and belief, was

deployed during the protests and demonstrations taking place between May 25, 2020 and

May 31, 2020. At all times relevant, Belcourt's actions violated Plaintiffs' rights as

alleged herein. At all times relevant, Belcourt was acting under color of state and federal

law, within the course and scope of her official duties and in accordance with the

customs, policies, and practices of the City of Minneapolis. Belcourt is sued in her

individual capacity.

21.     Defendant George Peltz is a resident of Minnesota. Peltz serves as an

officer in the Minneapolis Police Department, and on information and belief, was

deployed during the protests and demonstrations taking place between May 25, 2020 and

May 31, 2020. At all times relevant, Peltz's actions violated Plaintiffs' rights as alleged

herein. At all times relevant, Peltz was acting under color of state and federal law, within

the course and scope of his official duties and in accordance with the customs, policies,

and practices of the City of Minneapolis. Peltz is sued in his individual capacity.

22.     Defendant Sergio Villegas is a resident of Minnesota. Villegas serves as an

officer in the Minneapolis Police Department, and on information and belief, was

deployed during the protests and demonstrations taking place between May 25, 2020 and

May 31, 2020. At all times relevant, Villegas's actions violated Plaintiffs' rights as

alleged herein. At all times relevant, Villegas was acting under color of state and federal

law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the City of Minneapolis. Villegas is sued in his individual capacity.

23.     Defendant Toua Yang is a resident of Minnesota. Yang serves as an officer in the Minneapolis Police Department, and on information and belief, was deployed during the protests and demonstrations taking place between May 25, 2020 and May 31, 2020. At all times relevant, Yang's actions violated Plaintiffs' rights as alleged herein. At all times relevant, Yang was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the City of Minneapolis. Yang is sued in his individual capacity.

24.     Defendants John Does 1-100 are unidentified individuals who committed the various acts set forth below, or ordered other John Doe Defendants to commit excessive force, including as agents of Defendants, and are reserved for others who worked together with Defendants to effectuate the harm complained of herein. At all times relevant, John Does were acting under color of state and federal law, within the course and scope of their official duties and in accordance with the customs, policies, and practices of the City of Minneapolis. Defendants solely possess the discovery necessary to identify the John Doe Defendants. John Does are sued in their official and individual capacities.

## JURISDICTION AND VENUE

25.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this

matter, which arises in part under the laws of the United States including 42 U.S.C.

§ 1983.

26.     Venue is proper in this district under 28 U.S.C. § 1391, as Defendants

reside in this district, and the events or omissions giving rise to the claims set forth herein

occurred in this district.

## FACTUAL ALLEGATIONS

### a.  May 25, 2020- George Floyd was murdered by Minneapolis Police Officers

27.     On the evening of May 25, 2020, former MPD officer Derek Chauvin

pinned Mr. George Floyd—an unarmed black man who became increasingly immobile,

unresponsive, and eventually unconscious—to the ground with his knee pressing on

Mr. Floyd's neck. Two other former MPD officers—Thomas Lane and J. Alexander

Keung—assisted in holding Mr. Floyd down. A fourth former Minneapolis Police

Department officer—Tuo Thao—stood guard nearby to ensure that pedestrians and

bystanders recording the situation on their phones stayed on the sidewalk. These

bystanders pleaded with the former officers to "Get off of him!"

28.     Meanwhile, Mr. Floyd repeatedly pleaded for his life—"I can't breathe."

After kneeling on his neck for 8 minutes and 46 seconds, and only after the paramedics

arrived, did Chauvin get off of Mr. Floyd's neck.

29.     Only 20 minutes after Mr. Floyd's initial arrest, his limp body was loaded into an ambulance and he was pronounced dead at a nearby hospital around 9:25 pm. Mr. Floyd died in the custody and at the hands of the MPD.

30.     A bystander being held back by Thao, Darnella Frazier, posted her recording of the incident on Facebook Monday night. Her video of Mr. Floyd's death had gone viral by the next morning.

31.     Chauvin was a training officer, providing instruction to Lane and Keung, despite Chauvin having had 18 complaints filed against him since joining the MPD in 2001. Included in these complaints are a 2006 incident in which Chauvin and five other officers shot and killed a man who had stabbed his girlfriend and a friend; a 2008 incident in which Chauvin shot a man twice while responding to a domestic dispute; and a 2011 incident in which Chauvin and four other officers non-fatally shot a man. The last of these incidents resulted in Chauvin being placed on a 3-day leave. Five other complaints made against Chauvin predating 2012 resulted in no additional disciplinary action.[3] In 2017, Thao settled a suit brought by Lamar Ferguson, who said that during the course of his arrest, Thao "punch[ed], kick[ed], and kn[eed]" him "to the face and body" while he was handcuffed, breaking his teeth in the process. *Id.*

---

[3]     Erin Corbett, *The Officers Who Killed George Floyd Have Done This Before*, REFINERY 29 (June 1, 2020) https://www.refinery29.com/en-gb/2020/06/9848055/minneapolis-police-derek-chauvin-history-force.

**b. Tuesday, May 26, 2020- The Minneapolis Department Responds With Excessive Force to Peaceful Protests**

32.     MPD's initial response to the death of Mr. Floyd, and to the viral recording of it, was confusing, disjointed, and inconsistent. Early Tuesday morning, MPD said in a press release that a man had died after a "medical incident during [a] police interaction" and that Mr. Floyd had physically resisted officers. The press release made no mention of Chauvin's knee being on Mr. Floyd's neck for over 8 minutes. MPD would later walk back many of the statements it made in this press release.

33.     By Tuesday afternoon, all four MPD officers involved were fired, instead of being placed on paid administrative leave pending the investigation, which was the standard procedure.

34.     The protests and marches had been peaceful and somber events all day. Without justification, at 8:00 p.m., MPD began using crowd-control devices, including pepper spray, mace, tear gas, rubber bullets, and flash bangs, firing indiscriminately into the crowd of protestors.[4]

35.     In other areas of Minneapolis, around 8:15 p.m., police were also spraying tear gas on peaceful protestors who were singing and holding signs.[5]

**c. Wednesday, May 27, 2020- The Minneapolis Police Department Continues to Respond to Protests of Police Brutality with more Police Brutality**

---

[4]     Jack Rodgers, *The last days of May: A visual timeline of the George Floyd Protests*, MINNESOTA DAILY, (June 4, 2020), https://www.mndaily.com/article/2020/06/pf-the-george-floyd-protests-a-visual-timeline.

[5]     PM Breaking News (@PMBreakingNews), TWITTER (May 26, 2020, 8:15 PM), https://twitter.com/PMBreakingNews/status/1265451569719455747?s=20

36.     On Wednesday, Minneapolis officials announced that the tactics used by Chauvin (namely, the knee hold) were not sanctioned by MPD and released the names of the four officers involved in Mr. Floyd's death.

37.     On Wednesday evening, hundreds of protestors and people peacefully marched from Cup Foods to the 3rd Precinct building. The police again met peaceful protestors with unnecessary and excessive force. Though conflicting reports exist, the vast majority of protestors were peacefully demonstrating when the officers began arbitrarily spraying mace, pepper spray, tear gas, and rubber bullets at the people gathered.[6]

38.     Minneapolis City Council member Jeremiah Ellison told MPR, "We always do this—we create a barrier, put the police out there, put them in a line, put face masks, depersonalize them, make them look as scary as possible and we always get this result, and then we want to point the finger at community members."

### d.  Thursday, May 28, 2020- Police Use Excessive Force in Downtown Minneapolis on Group of Protestors

39.     On Thursday, the Governor of the State of Minnesota, Tim Walz, signed Executive Order 20-64, which declared a peacetime state of emergency and activated the

---

[6]     Holly Bailey, Kim Bellware, and Brittany Shammas, *Chaotic scene in Minneapolis after second night of protests over death of George Floyd,* WASHINGTON POST (May 27, 2020), https://www.washingtonpost.com/nation/2020/05/27/george-floyd-minneapolis-reaction/

Minnesota National Guard to assist in public safety efforts for the next several days.[7]
National Guard troops would not appear on the streets until very early Saturday morning.

40.    Protestors again gathered and peacefully marched through Minneapolis,
with marches occurring throughout the city. Yet, police responded to the presence of
protestors, most peaceful, with less-than-lethal measures.

41.    At approximately 6:43 p.m., a group of nonviolent protestors near the 3rd
Precinct were shot with tear gas.[8]

### 1. Lauren Coleman's account

42.    On May 28th, 2020, Coleman was participating in a peaceful march and
protest through downtown Minneapolis, beginning at Government plaza and eventually
marching toward Hennepin Avenue.

43.    When the group of peaceful protestors arrived at the intersection of
Hennepin Avenue and 5th Street, the organizers of the march began speaking and the
group was standing still.

44.    According to Coleman, all of a sudden, people started running. When she
turned around, there were three MPD SUVs coming toward her and the group of
protestors, westbound down 5th Street. Pepper spray was streaming out the windows of at
least one of the MPD SUVs.[9]

---

[7]     Exec. Order No. 20-64 (May 28, 2020), https://mn.gov/governor/assets/EO%2020-64%20Final_tcm1055-433855.pdf
[8]     Camila (@camilateleSUR), Twitter (May 27, 2020, 6:43 PM), https://twitter.com/camilateleSUR/status/1265790657744027650?s=20
[9]     Jennifer Brooks (@stribrooks), Twitter (May 28, 2020, 8:57 PM), https://twitter.com/stribrooks/status/1266186985041022976?s=20

45.    One officer in the MPD SUVs was Samantha Belcourt, who sprayed pepper spray out her squad car window at Coleman and other protestors.

46.    Coleman was hit in the face with pepper spray causing tremendous pain.

47.    MPD Officer, Defendant Samantha Belcourt, sprayed Coleman and other protestors without any justification, as they presented no immediate threat and were not actively or passively resisting arrest.  Other John Doe Defendants ordered these MPD officers to fire tear gas at the peaceful protestors.

48.    Any excuse that the pepper spraying was necessary to clear the way for the vehicle rings hollow, as two other MPD vehicles proceed without any blockage before the MPD SUV spraying the pepper spray comes through.  In the Twitter video, no protestors are seen attempting to jump the vehicle, but instead were holding signs and exercising their First Amendment rights.

49.    Coleman and some other protestors ended up in front of Dreamgirls by the light-rail stop. Coleman had trouble breathing and could not see for several minutes, until a fellow protestor flushed her eyes out. After 10 minutes, she could see again, and she biked away.

50.    She believes that, had she not been so quick to move out of the way, she would have been hit by the MPD SUVs.

51.    Since this incident, Coleman has experienced heightened sensitivity in her eyes and emotional distress, including an inability to sleep.

## 2. Jonathan Mason's account

52.    Mason was peacefully protesting in Downtown Minneapolis near the Mayo Clinic building on Hennepin Ave and 6th Street on the evening of May 28, 2020.

53.    There was a line of State Patrol officers in formation with billy-clubs blocking the road.

54.    Mason was walking up and down near the line of State Patrol officers with his hands up, recording the scene, and announced several times that he had his hands up.

55.    That recording is attached hereto as Exhibit A.

56.    He then verbally engaged one of the State Patrol officers and told the State Patrol officer he had nothing to be afraid of. That State Patrol officer looks at Mason and, according to Exhibit A, appears to nod in acknowledgment.

57.    At no time did any State Patrol officer give Mason a warning to back-up or disperse or give the slightest indication Mason presented an immediate threat.

58.    Despite the lack of any action by the State Patrol, an MPD officer, Defendant Sergio Villegas comes from behind the State Patrol officers and pepper sprays Mason as Mason is having a non-confrontational discussion with one of the State Patrol officers.

59.    Mason suffered tremendous pain as a result of the pepper spray. He inhaled some of the pepper spray, and lost his voice for 3 days as a result.  This chilled and inhibited his ability to participate in other peaceful protests throughout the weekend. Mason was further emotionally traumatized and could not sleep for several days.  He was

also forced to throw away his clothes, including a hat inherited from his grandfather that had sentimental value.

### e.  Friday, May 29, 2020

60.     On the afternoon of Friday, May 29, 2020, Chauvin was charged with third-degree murder and second-degree manslaughter. On June 3, 2020, the charges against Chauvin were elevated to second-degree murder. Also, on June 3, Lane, Keung, and Thao were charged with aiding and abetting murder and manslaughter.

61.     Governor Walz's Executive Order 20-65 imposed a curfew of 8:00 p.m. for the cities of Minneapolis and Saint Paul on Friday night.

62.     A Multi-Agency Command Center ("MACC"), a temporary coordinating agency under the Minnesota Department of Public Safety,[10] was activated by State officials on May 29 and was disbanded on June 7.[11] The MACC served as a unified command of federal, state, and local law enforcement and public safety agencies to support the state's response to any unrest that developed following the death of George Floyd. The agencies represented in the MACC included the Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling

---

[10]     Bruce Gordon, *Multi-Agency Command Center Report on Civil Unrest*, MINN. DEP'T OF PUB. SAFETY (May 31, 2020), https://dps.mn.gov/divisions/ooc/news-releases/Pages/multi-agency-command-center-report-on-civil-unrest.aspx

[11]     Alleen Brown, Mara Hvistendahl, *Law enforcement scoured protester communications and exaggerated threats to Minneapolis cops, leaked documents show*, THE INTERCEPT (June 26, 2020, 1:07 PM), https://theintercept.com/2020/06/26/blueleaks-minneapolis-police-protest-fears/; Melissa Macaya, *et al*., *George Floyd protests spread nationwide*, CNN (May 30, 2020), https://www.cnn.com/us/live-news/george-floyd-protest-updates-05-28-20/h_0e15f1868934ae06917f161801cf475e

Enforcement, Division of Homeland Security and Emergency Management, State Fire

Marshal division, Minnesota State Patrol); National Guard; Minneapolis Police

Department; Saint Paul Police Department; Metro Transit Police; Bloomington Police;

University of Minnesota Police; Sheriff departments from Ramsey County, Hennepin

County, Anoka County, Dakota County, Washington County; and the FBI.

63.     The MACC, which included the MPD, coordinated the law enforcement

response to the protests. For instance, when deputies from Anoka County arrived on

scene, they followed state orders, joined the patrol, and cut the tires on vehicles on

Washington Avenue, according to Anoka County Sheriff's Lt. Andy Knotz.[12] Knotz said

the deputies got their directions from the MACC and also confirmed that the MACC was

coordinating law enforcement during the protests connected to Mr. Floyd's death.[13]

64.     At 11:20 p.m., Minneapolis Mayor Jacob Frey tweets, "We are working

with the State National Guard & MN DPS – who control Incident Command tonight – to

provide support in South."[14] On information and belief, the "we" to which Mayor Frey

refers is the MPD.

65.     Outside the 3rd Precinct, tear gas was fired at peaceful protestors just

before curfew took effect.  The protestors had their knees on the ground, and their fists in

the air.  Despite the clear show from protestors that they did not intend to be violent, and

---

[12]     Paul Walsh, *Officers slashed tires on vehicles parked amid Minneapolis protests, unrest*, STAR TRIBUNE (June 11, 2020, 8:26 AM), https://www.startribune.com/officers-slashed-tires-on-vehicles-parked-during-mpls-protests-unrest/571105692/

[13]     *Id.*

[14]     Jacob Frey (@MayorFrey), TWITTER (May 29, 2020, 11:20 PM), https://twitter.com/MayorFrey/status/1266585209337786369?s=20

instead intended (at worst) to display civil disobedience, they were met with unnecessary and excessive force from MPD and other law enforcement.[15]

### f. Saturday, May 30, 2020 - Police descend upon a large group of peaceful protestors

66.     Governor Walz's Executive Order 20-65 imposed a curfew of 8:00 p.m. for the cities of Minneapolis and Saint Paul for Saturday night also. The Executive Order did not contain an authorization to use less-lethal force to accomplish the curfew.  The Curfew FAQ posted by the Multi-Agency Command Center expressly allows for people to be in their front yards and backyards after 8:00 p.m.

67.     At 11:30 p.m., MN DPS tweeted "Officers from MN law enforcement agencies, the @MNNationalGuard & @MnDPS_DPS are working together at the Multi-Agency Command Center to coordinate tonight's public safety response."[16]

68.     The Minnesota Department of Transportation shut down freeways in the vicinity of Minneapolis from 7 p.m. through 6 a.m.

69.     Shortly after curfew, MPD officers and other law enforcement began to use tear gas and other less-than-lethal measures on anyone and everyone that was out, including journalists, people on their porches, and peaceful protestors without justification.

---

[15]     Ryan Faircloth, *Minnesota Gov. Tim Walz: 'This is about chaos' as new fires, looting hit Minneapolis,* STAR TRIBUNE (May 30, 2020, 1:20 PM), https://www.startribune.com/walz-bolsters-guard-troops-after-4th-destructive-night/570882282/

[16]     Minn. Dep't of Pub. Safety (@MnDPS_DPS) TWITTER (May 30, 2020, 9:37 PM), https://twitter.com/MnDPS_DPS/status/1266950063894466560?s=20

70.     In one incident, caught on video, a law enforcement officer shot a marking round at people gathered on their porch, an activity expressly allowed in the curfew order and even encouraged by the City of Minneapolis.[17]

71.     In another incident, CNN journalist Ali Velshi was reporting on the protests at Nicollet Avenue and Franklin Avenue at 8:39 p.m. in Minneapolis when the group, including himself, was shot with tear gas and rubber bullets.[18] Velshi reported it was a "100% peaceful march" prior to the use of less-lethals.

72.     Only a few minutes later in the same area of Nicollet and Franklin, another journalist, Tom Aviles, was shot with a rubber bullet and arrested.[19]

73.     In another incident captured on video, around 8:50 p.m., a group of protestors was sitting on the ground at the intersection of 31st Street and Nicollet Avenue near the Fifth Precinct when the MPD, the State Patrol, and National Guard sprayed tear gas on the group.[20]

---

[17]     Tanya Kerssen (@tkerssen), TWITTER (May 30, 2020, 11:20 PM), https://twitter.com/tkerssen/status/1266921821653385225?s=20; Kare 11, *Paint canisters shot at Minneapolis residents on their porch*, YOUTUBE (May 30, 2020), https://www.youtube.com/watch?v=LozQg0oX-Gw

[18]     Zac Bears (@zacbears), TWITTER (May 30, 2020, 10:06 PM), https://twitter.com/zacbears/status/1266929072560582658?s=20; Jeremy Barr, *MSNBC's Ali Velshi on Covreing Protests Amid Press Attacks: "We exist to Hold Power to Account"*, THE HOLLYWOOD REPORTER (June 3, 2020, 9:02 AM), https://www.hollywoodreporter.com/news/msnbcs-ali-velshi-covering-protests-press-attacks-we-exist-hold-power-account-1296797

[19]     Caroline Linton, *Photographer with CBS Minnesota released from custody after being struck with rubber bullet and arrested,* CBS NEWS (May 31, 2020), https://www.cbsnews.com/news/tom-aviles-arrested-wcco-photographer-arrested-and-shot-with-rubber-bullet-2020-05-30/

[20]     Aisha (@seoulschim), TWITTER (May 30, 2020, 8:50 PM), https://twitter.com/seoulschim/status/1266909888896282625?s=20

74.     In yet another incident, around 9:28 p.m., Minneapolis Police fired rubber bullets on a news crew standing nowhere near protestors in the corner of a parking lot.[21]

75.     NBC journalist Ed Ou also captured incidents occurring near the Fifth Precinct on video.[22] Ou was documenting protestors peacefully listening to speeches and chanting when State Patrol Troopers arrived at the scene on buses. Immediately, State Troopers began deploying flash bangs, tear gas, and pepper spray on the crowd. A flash bang exploded right in front of Ou's face, disorienting him. While recovering from this shock, Ou was sprayed in the face with pepper spray at close range. He was then struck in the face with another exploding flash bang and was bleeding from the head. He asked State Patrol Troopers for help, but was ignored. This injury resulted in a permanent scar on Ou's forehead.

76.     Major Joseph Dwyer was commanding the State Patrol Troopers during the incident captured by Ed Ou.[23] Dwyer completed a Commander's Report corresponding to this incident, in which he described protestors throwing debris (including rocks, bricks, bottles, fireworks, and chunks of construction concrete) at State Troopers as soon as they arrived on the scene.[24] Dwyer further reported that chemical munitions were fired in response to the aggressive actions of the protestors.[25]

---

[21]     Michael George (@MikeGeorgeCBS), TWITTER (May 30, 2020, 9:28 PM), https://twitter.com/MikeGeorgeCBS/status/1266919447970942986?s=20
[22] https://twitter.com/edouphoto/status/1267981849537609728
[23] Transcript of Motions Hearing held on 7/29/2021, *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW-DTS) (D. Minn. June 5, 2020), ECF 203 at 269.
[24] *Id.* at 269-270.
[25] *Id.* at 271.

77.     However, Dwyer has since testified that Ou's video directly refutes the allegations contained in his Commander Report: at no point can debris be seen being launched at Troopers, nor is there any debris on the ground near the Troopers that would indicate prior attacks.[26] Indeed, at no point during the video was Dwyer able to point out when and where the State Troopers were under fire from projectiles thrown by protestors.[27]

78.     Dwyer, acting in his capacity as Captain and commander of the Mobile Response Team, authorized State Troopers to deploy massive amounts of less-lethals, despite the apparent absence of any threat to a Trooper posed by a protestor.

79.     Pursuant to Department of Public Safety policy, the "degree of force used must be reasonable under the circumstances" and "should be in response to the subject's actions".[28] As such, the degree of force used should be that "necessary to overcome the resistance or aggression of the subject."[29] As the protestors present at this scene were peaceful (and indeed posed no threat whatsoever to the State Patrol), Dwyer's authorization and use of chemical munitions was in violation of the Department of Public Safety policy.

80.     "An External Review of the State's Response to the Civil Unrest in Minnesota from May 26-June 7, 2020" prepared by Wilder Research reports the State

---

[26] *Id.* at 272-74.
[27] *Id.* at 275-276 ("In looking at this, perhaps it didn't reach that initial line, but it's not any depiction of what's happening to the south of us—or to to the north of us…I'm not going to be able to point it out on this video.").
[28] Dep't of Public Safety, "Use of Force Policy" at 27 (effective May 5, 2003).
[29] *Id.*

Patrol's strategy in responding to this protest was to employ a tactic called "shock and awe". This strategy involves using "significant crowd dispersal methods"[30]. As evidenced by Ou's video, the "shock and awe" tactic equated to deploying massive amounts of less-lethals on a peaceful crowd. One State Law Enforcement official reported that the tactic communicated through the chain of command was to "go down there and give them everything you got."[31] According to the report, anywhere from 2,500 to 3000 people were affected by this strategy.[32]

81.     In direct contradiction with the Department of Public Safety Use of Force Policy[33], neither Dwyer nor the other State Troopers completed use of force reports corresponding to this incident, despite the huge quantity of less-lethals deployed.[34]

82.     According to Minnesota State Patrol disciplinary procedures, any State Trooper found to have violated a State Patrol policy would be subject to disciplinary action.[35] However, neither Dwyer nor other officers were disciplined in connection with this incident.

---

[30] Wilder Research, *External Review of the State's Response to Civil Unrest May 26-June 7, 2020*, 12 (Mar. 2022).

[31] *Id.* at 30.

[32] *Id.* at 12.

[33] Decl. of Joseph Dwyer, *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW-DTS) (D. Minn. June 5, 2020), ECF 147 at Ex 2 ("For any involvement under [the First Amendment Assemblies] policy, Troopers shall complete and submit a detailed field report documenting their activities.").

[34] Dep't of Public Safety, "Use of Force Policy" (effective May 5, 2003) at 33.

[35] Transcript of Motions Hearing held on 7/29/2021, ,*Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW-DTS) (D. Minn. June 5, 2020), ECF 203 at 208.

83.     In addition to failing to complete use of force reports contemporaneously with this and other incidents, Dwyer subsequently destroyed his emails and texts from May 26 to May 31, 2020 in the following weeks.[36] Dwyer believes the vast majority of State Patrol Troopers also deleted their own emails and texts from this time, and may have done so at his instruction.[37]

### 1. Bonnie Brown's account

84.     Brown had been protesting all day, and just before 8 p.m., was sitting and singing with a large group at the intersection of 31st Street and Nicollet Avenue in front of the 5th precinct.

85.     Brown and the other protestors were peacefully sitting, listening to speeches, and engaged in group prayers.  While past curfew, the protestors were at most engaged in civil disobedience, and were not being violent or failing to follow any commands given by law enforcement, nor were actively or passively resisting arrest.

86.     Brown suddenly saw MPD officers and National Guard troops approaching; they had given no warnings or dispersal orders. The officers and troops began shooting tear gas, rubber bullets, and flash bombs into the group of people that had been sitting and singing. Defendant John Doe 3 gave the order to fire on the protestors.

87.     Brown ingested tear gas and a flash bang went off right in front of Brown. She started running away but was still being shot at with tear gas, which she ingested. The tear gas made Brown start choking, and she felt as though she could not breathe.

---

[36] *Id.* at 259.
[37] *Id.* at 265-66.

Brown initially got her eyes flushed with milk, but still was in tremendous pain.  Brown felt as though she was going to collapse.

88.    Brown witnessed several people get hit with rubber bullets.

### 2.  Jordan Meyer's account

89.    Jordan Meyer was peacefully protesting on Saturday, May 30, 2020, near the 5th precinct.

90.    At 8:00 p.m., the start of curfew, everyone went into prayer lead by Christian and Muslim faith leaders. There were families with children present. Many people were sitting or kneeling on the ground.

91.    A video captured by WCCO reporters shows the peaceful scene at 8:00 p.m.—and most importantly, no protestors are holding weapons or displaying violence.[38]

92.    These pictures, taken by Meyer, show the scene at 7:44 p.m. and 8:06 p.m., respectively.  Everyone is sitting and peacefully exercising their First Amendment right to speech and protest.

---

[38]    WCCO – CBS Minnesota, *Curfew Goes Into Effect, Hundreds Remain At 5th Precinct,* YOUTUBE (May 30, 2020), https://www.youtube.com/watch?v=9o8yqN7FcRU





93.     Shortly after 8:00 p.m., Meyer sees a giant convoy of MPD officers and State Patrol Troopers heading towards the crowd of protestors. No disbursement order is given.

94.     At approximately 8:42 p.m., the MPD and State Troopers begin deploying tear gas and shooting flash bangs into the group of protestors, despite the demonstration's peaceful nature. Meyer witnessed law enforcement officers shooting green paint canisters off, to track protestors, which are 4 times bigger than the size of a paintball.

95.     Meyer got tear gas in his eyes and could not see as he was running away.

### 3.   Jamal Samaha's account

96.     Jamal Samaha was among the peaceful protestors at the 5th precinct. He arrived around 5 or 6 p.m.

97.     There was chicken-wire fencing separating the protestors from the officers.

98.     The crowd of protestors was sitting in prayer at 8:00 p.m. Around 15 minutes later, Samaha heard screaming and saw people running toward them.

99.     MPD officers and State Patrol Troopers came from every direction to box the protestors in and disperse them toward the northeast. At this point, tear gas and flash bangs were being deployed into the middle of the crowd of protestors, who moments ago, were peacefully sitting and praying. Samaha was sitting next to a 4- or 5-year old child that got tear gassed. Samaha was also hit with tear gas and flash bangs.

100.    Samaha witnessed officers in their squad cars trying to run people over, even people on the sidewalks, to arrest them.

101.    Defendant John Doe 4 fired tear gas at Samaha, Meyer, Brown, and other protestors.  Other John Doe Defendants ordered MPD and other law enforcement officers to fire tear gas and other less-lethal munitions at peaceful protestors. Defendant Dwyer gave the same order to State Patrol Troopers.

> **g.  Sunday, May 31, 2020- The police attack peaceful protestors on 1-35W and surrounding areas**

102.    On the evening of Sunday, May 31, 2020, Executive Order 20-68 imposed a curfew of 8:00 p.m. for the cities of Minneapolis and Saint Paul.

103.    The state moved up its planned road closures, including I-35W and I-94, from 7:00 p.m. to 5:00 p.m.

104.    Andy Delany, Jamal Samaha, Bonnie Brown, and Jordan Meyer ("35W-bridge Plaintiffs") were among the thousands of people peacefully protesting and marching through Minneapolis and onto the I-35W bridge, and then unreasonably the targets of excessive less-lethals when they attempted to disburse.

105.    Another video taken by a WCCO reporter shows the peaceful protests on the bridge.[39]

106.    At 5:46 p.m., a large semi-tanker truck plows through the crowd standing in the northbound lane of the I-35W bridge.[40]

---

[39]     WCCO – CBS Minnesota, *Protesters March Onto I-35W Bridge Over Mississippi River, Spanning Its Width*, YOUTUBE (May 31, 2020), https://www.youtube.com/watch?v=Oaeo10Z5Z0c

[40]     Kirsten Swanson (@KirstenKSTP), TWITTER (May 31, 2020, 6:26 PM), https://twitter.com/KirstenKSTP/status/1267236096083140608?s=20

107.    The 35W-bridge Plaintiffs and other protesters were rightfully terrified the tanker had intended to run them over, or that the tanker had a bomb that was set to explode.  The bulk of the protestors began to flee after being traumatized by the horrific sight of a tanker barreling toward them.  Protestors scattered in all directions, including over the median on I-35W and onto the other nearby roads highways.

108.    Shortly after the semi-tanker drove into the crowd, MPD vehicles drove onto I-35W from every nearby exit and entrance ramp, and at least two of the MPD vehicles entering I-35W slowed down to spray people leaving the protest with tear gas.[41]

109.    According to Minneapolis Police's Twitter, "MPD acting in a support role to the State Patrol on I35W."[42]

110.    No Plaintiff heard any dispersal order given.

### 1.  Jamal Samaha's Account

111.    Jamal Samaha was protesting on the southbound lane of the I-35W bridge. He saw thousands of people standing there. There were also thousands of people sitting in the northbound lane, many of whom were praying.

---

[41]      Minn, Dep't. of Pub. Safety (@MnDPS_DPS), TWITTER (May 31, 2020, 7:40 PM), https://twitter.com/CFBStatlerWald/status/1267254791429853193?s=20; Now That's Crazy, *Minneapolis Cops pepper spraying people out of moving squad cars*, YOUTUBE (June 6, 2020), https://www.youtube.com/watch?v=DSg04ICitEA
[42]      Minneapolis Police (@MinneapolisPD), TWITTER (May 31, 2020, 6:50 PM), https://twitter.com/MinneapolisPD/status/1267242058625871872?s=20

112.    This is a photo of the peaceful protestors just before the truck barreled through at 5:43 p.m. Most protestors are seen sitting peacefully.



113.    The announced goal of the protestors was to have Mayor Frey join them, and it had been announced that he would join in fact join the protestors.

114.    Samaha jumped onto the median between the southbound and northbound lanes and as he was standing up there for a few seconds, he heard a horn blaring from down the road. Samaha heard people screaming and saw people running. He saw the semi-tanker truck going northbound at approximately 70 mph.

115.    The truck eventually stopped only a few feet from where Samaha was standing. Samaha began pulling people over the median from the northbound lane and

into the southbound lane to get them out of harm's way. Samaha and the protestors were afraid the truck was an intentional attack on them and that it could blow up.  Samaha witnessed a woman have a seizure, likely as a result of the trauma of the tanker plowing through the crowd.  A few squad cars arrived, Samaha thought to presumably arrest the driver.  Samaha witnessed a few black men protecting the driver and attempting to deliver the driver to the police, but Samaha saw these black men being pepper sprayed for their efforts.

116.    Shortly after the driver was pulled out of the truck by some protestors, Samaha saw a Metro Transit bus and several squad cars and Humvees full of officers head south down the northbound lane into the group of protestors. There are also officers in squad cars coming down the exit ramp onto the southbound lane. Samaha thought the officers were coming to help the protestors to see if anyone was hurt by the semi-tanker truck.

117.    The officers were not there to help or protect the protestors.

118.    Samaha saw the officers coming into the southbound lane spraying mace or pepper spray at protestors who were running up the exit ramp and attempting to leave. Samaha witnesses people throwing up and who were clearly in need of help.

119.    The National Guard was also dispersed among the MPD on the I-35W bridge and had their AR-15s pointed at the protestors. Samaha saw at least one National Guard soldier with his finger on the trigger of the gun he was pointing at protestors.

120.    At this point, Samaha witnessed the MPD officers put on their own gas masks and start spraying tear gas at the already dispersing crowd of protestors. Samaha

31

also witnessed the officers shooting rubber bullets at protestors. Samaha and other protestors had their hands up and were screaming "Hands up Don't Shoot."

121.    When Samaha and others finally get to the exit ramp off the southbound lane, the MPD squad cars were parked in such a way so as to herd the protestors in a particular direction up the ramp. Samaha never heard any verbal warning to disperse or that any measure of force was to be used.

122.    Samaha was hit by tear gas and pepper spray as he was attempting to leave the bridge. This caused significant pain and suffering.

123.    Defendant John Doe 5 sprayed Samaha and other protestors.  Other John Doe Defendants ordered MPD and other law enforcement officers to spray pepper spray and fire tear gas.

124.    Samaha continues to be emotional traumatized by the actions of the MPD and law enforcement, and his mental health has suffered as a result.

## 2.  Jordan Meyer's account

125.    Jordan Meyer and his girlfriend participated in a march through downtown Minneapolis that started at U.S. Bank Stadium, crossed the Hennepin Avenue bridge—where the group took a knee in a moment of silence for George Floyd—and continued onto the I-35W bridge. There were no police officers present.

126.    The protestors, including Meyer, were initially only in the northbound lane. Eventually, sometime after 5 p.m., there were so many protestors that they completely took over the north and southbound lanes.

127.    At this point, all traffic had been stopped, as the State Patrol was working to close all highways in and out of Minneapolis.

128.    Meyer saw the semi-tanker plow toward the crowd, which created panic and fear among the protestors.  Many people were attempting to flee.  Meyer witnessed the same woman Samaha saw having a seizure, likely as a result of the terror caused by the semi plowing through the crowd.

129.    Meyer witnessed several black men protect the driver of the semi.  The police arrived within a few minutes, and pepper sprayed the men protecting the driver who had attempted to deliver him to the police.

130.    After seeing the driver arrested, Meyer and many other protestors attempted to leave the unsafe situation and to get off of the bridge via an exit ramp.  MPD and other law enforcement began firing rubber bullets at the crowd.  Meyer also saw MPD and other law enforcement vehicles drive down the ramp, but slow down to pepper spray protestors who had their hands up.

131.    At no point did the police give any commands to the crowd, nor was there any aggression on the part of protestors towards the police.

132.    Meyer watched as law enforcement pepper sprayed and tear gassed the crowd that was fleeing on one of the off ramps, and actually forced them back onto the bridge near the semi-tanker.  Thus, the police forced the protestors to return from the very place they were fleeing.  MPD had no justification for this show of force and committed multiple acts of brutality on people who they should have been protecting.

133.    Pepper spray was applied broadly throughout the crowd being forced back onto the bridge. Meyer got pepper spray in his eyes, causing a great burning pain in his eyes.  Meyer did get his eyes flushed with milk, which alleviated some of the pain, but not completely.

134.    Defendant John Doe 6 used less-lethal munitions against Meyer and other protestors.  Other John Doe Defendants ordered MPD and other law enforcement officers to spray pepper spray and fire tear gas.

### 3.  Mary Grace's account

135.    Grace was in the northbound lane of the I-35W bridge near the Seven Corners Apartments with a smaller group of people. During the moment of silence, Grace saw people sitting, some with children, and saw women with strollers among the protestors.

136.    After the semi-tanker plowed the crowd, Grace and other protestors fled for their safety. Grace jumped over a fence to get off the I-35W bridge. She was near 14th Avenue and 1st Street, near the Seven Corners apartments.

137.    Grace was helping other people also jump the fence and get off the highway when she suddenly saw police and heard sirens but did not hear any commands. The police were soon pulling the people down off the fence as they were attempting to climb over it to get to the same side as Grace.

138.    Grace could see across the bridge and could see others getting sprayed with tear gas and could hear people screaming.

139.   An MPD officer started spraying mace on a person they had pulled off the fence who was laying on the ground in a fetal position. When Grace started yelling at the officer to stop, explaining that he was trying to leave the area where the tanker came through, the officer instead started spraying Grace through the fence with mace.

140.   Defendant George Peltz sprayed Grace in the face at least 4 times through the fence with mace. Grace is 5'0 feet tall and was physically separated from Defendant Peltz by a barrier.  It was impossible for her to be an immediate threat to his safety.

141.   Despite using mace to stop the person for whom Grace was pleading to let go, Defendant Peltz then allowed that person to climb the fence.  This demonstrates that neither Grace, nor the other person initially being sprayed with mace, were doing anything unlawful, and certainly were not actively or passively resisting arrest, obstructing any legal process, or otherwise presenting an immediate threat.

142.   Grace was temporarily blinded by the mace and experienced significant pain and suffering.  Grace had some cuts on her arms that the mace had entered.  Those cuts burned all through the next day.  Grace was in significant pain for at least 12 hours.

143.   Grace has been further emotionally traumatized by Defendant Peltz assaulting her with mace.

### 4.  Andy Delany's account

144.   After learning of the semi-tanker speed through the crowd of protestors on the I-35W bridge, Delany started walking to the bridge from downtown Minneapolis to offer help and support to the protestors. He never got to the bridge, and was instead caught up in the melee around Bobby and Steve's. What Delany experienced is partially

documented by Mike Max, a WCCO reporter, during a live broadcast.[43] Just as Max

announces that the Joint Command was allowing these protestors to leave and

presumably not use force against them, MPD and other law enforcement begin using less-

lethals on protestors.

145.    Around 8:15 p.m., the protestors were being forced up the southbound exit

ramp to Washington Avenue near Bobby and Steve's gas station. Delany witnessed MPD

officers spraying pepper spray on the protestors as they came up the ramp.

146.    The protestors were still peacefully chanting and holding signs on

Washington Avenue near the entrance to Bobby and Steve's. Many of the protestors had

left and only a small crowd, including Delany remained. Delany was walking near Bobby

and Steve's. MPD officers also pepper sprayed the crowd near Bobby and Steve's that

Delany was in.

147.    Around 8:45-9:00 p.m., a line of MPD officers on bikes had closed 3rd

Street, behind Bobby and Steve's. The line of officers on the northside, near the exit

ramp, began to close in and the protestors started to panic. The protestors started to run

west and south towards downtown, including running south down 3rd street.

148.    The protestors started jumping over fences to escape the police and the

police started shooting rubber bullets at them.

---

[43]      WCCO – CBS Minnesota, *Mike Max Describes How Protesters Are Getting Cornered By Police*, YOUTUBE (May 31, 2020), https://www.youtube.com/watch?v=uq6wzFo59jg

149.    This caused the protestors to run north, into the parking lot of 1200 South Washington Avenue, the building across the street from Bobby and Steve's.

150.    The protestors, including Delany, tried to leave the parking lot, but MPD officers closed off the exit. That left the protestors standing in the parking lot with the line of MPD officers advancing.

151.    Delany watched the following as he was corralled in the parking lot: some protestors were in their cars in the parking lot, trying to leave, but one of the MPD officers that was advancing got to one of the cars with protestors inside, opened the driver side door, shoved his gun inside, and threw the lady in the driver's seat out of the car to the ground. The lady was screaming hysterically, and bystanders were yelling at the officer who threw her out of her car.

152.    MPD officers then tear gassed the crowd of protestors that were trying to leave via their cars, including Delany. As some protestors were hit with the tear gas, the group retreated away from the officers.

153.    The lady who had been thrown from her car was walking with her hands up, hunched over and sobbing, taking small steps. She appeared to be disoriented and in shock or having a panic attack. The line of police was advancing quicker than her from behind. Four or five people, including Delany, went to help the woman, including a woman who was carrying medic gear.

154.    This small group of protestors, including Delany and the lady, ran for about 2-4 seconds and only went about 10-20 feet when a few MPD officers reached them. One woman got her arm around the lady while Delany turned to face the police.

37

155.    Defendant Toua Yang sprayed Delany in the face with pepper spray and a second spray of pepper spray covered the back of his head and neck after he had turned away and went inside of Delany's jacket. He immediately felt the burning sensation and tried to open his eyes to run away.

156.    As Delany was running across Washington Avenue, back towards Bobby and Steve's, he saw an officer wearing a blue uniform 10 feet in front of him. Delany stopped moving and put his hands up but was pepper sprayed again, without warning, directly in the face by Defendant John Doe 9.

157.    Other John Doe Defendants ordered MPD and other law enforcement officers to fire tear gas and other less-lethal munitions at peaceful protestors.

158.    Delany ran back to the main group of people in the parking lot between Bobby and Steve's and Maxwell's, and someone helped him flush his eyes out. Delany was unable to open his eyes until he got some milk to pour in them, which only helped a little. His neck and arms continued to burn for many hours.

159.    Delany and several others were, at this point, completely surrounded by a full ring of MPD officers. The group decided to sit down.

160.    A loudspeaker then announced that everyone was under arrest. The MPD officers slowly started pulling people out of the circle to process them.

161.    When Delany was arrested, his hands were zip-tied together, he was loaded into a paddy wagon, and sat for 20 minutes before they were driven downtown.

162.    Delany asked two MPD officers he was next to if there was anything they could do to help with the burn from the pepper spray. They both laughed. One officer

38

said that time and wind would be his best friend. The other officer said no, that Delany would have to wait it out. Delany later asked a third MPD officer for help and he chuckled and said that everyone has been pepper sprayed and that "it sucks."

163.    At another point in the evening, Delany witnessed an MPD officer put pepper spray inside of car with people in it and fill the car with pepper spray.

164.    Numerous videos detail other protestors' experiences, including having MPD and law enforcement shoot out windows and unreasonably tear gas protestors.[44]

### 5. Bonnie Brown's account

165.    Brown was marching and protesting with a large group on I-35W when the semi-tanker came through the crowd on I-35W. Brown and those around her had been and were still peacefully protesting.

166.    According to Brown, about 20 minutes after the 8:00 p.m. curfew, MPD officers and other law enforcement started spraying tear gas into the group of people she was with on I-35W under the Washington Avenue bridge and I-94 overpasses.

167.    John Doe Defendants sprayed Brown and other protestors.  Other John Doe Defendants ordered MPD and other law enforcement officers to spray pepper spray and fire tear gas.

168.    After she was hit with tear gas, she ran up a hill and was on Washington Avenue. She was coughing.

---

[44]    Jennifer Brooks (@stribrooks), TWITTER (May 31, 2020, 12:17 AM), https://twitter.com/stribrooks/status/1266961981942239233?s=20; AP Archive, *Police fire tear gas, rubber bullets at protestors,* YOUTUBE (June 4, 2020), https://www.youtube.com/watch?v=T6obZCqb9bk

169.    There were approximately 200 people in the same group with Brown on Washington Avenue. They all started chanting with their hands up: "Hands Up. Don't Shoot."

170.    This group of approximately 200 was again sprayed with tear gas and started running to the east, trying to leave. Brown was again hit with tear gas and by this point, was having trouble breathing.

171.    The officers started shooting rubber bullets at Brown and the group that was attempting to flee the area.

172.    At this point, Brown witnessed a woman, who was also trying to run away from the officers shooting rubber bullets, get hit with a rubber bullet. That woman landed on the ground unconscious.

173.    Brown was still on Washington Avenue when she was sprayed with tear gas a third time. John Doe Defendants ordered MPD and other law enforcement officers to fire tear gas at peaceful protestors.

174.    Brown and the group of protestors tried to show the MPD officers they were peaceful protestors, so they sat down. They were immediately surrounded by MPD officers.

175.    Brown witnessed one male protestor who was told to keep his hands up, but then told by another MPD officer to put his hands down. When the group tried to get clarification, the MPD officers pointed their guns and them.

176.    Brown and the others were arrested, handcuffed for 5 hours, and taken on a bus where she was booked and released.

40

### h.  MPD's Policies regarding Use of Force

177.   MPD's Policy & Procedure Manual ("MPD Policy")[45] defines "Use of Force" as: "Any intentional police contact involving: (1) the use of any weapon, substance, vehicle, equipment, tool, device or animal that inflicts pain or produces injury to another." 5-302 Use of Force Definitions.

178.   According to the same MPD Policy, and Minn. Stat. § 609, subd. 1, "When authorized . . . except as otherwise provided in subdivision 2, reasonable force may be used upon or toward the person of another without the other's consent when the following circumstances exist or the actor reasonably believes them to exist: When used by a public officer or one assisting a public officer under the public officer's direction: In effecting a lawful arrest; or In the execution of legal process; or In enforcing an order of the court; or In executing any other duty imposed upon the public officer by law." 5-303 Authorized Use of Force.

179.   Kinetic impact projectiles, including rubber bullets and 40-mm "less lethal" foam rounds, are "not meant to take the place of deadly force options," but rather "[t]he MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that require special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations." 5-317(I).

---

[45]     Minneapolis Police Department, *Policy & Procedure Manual* (The May 27, 2020 version of these policies is available at https://web.archive.org/web/20200527123248/http://www2.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300 )(last accessed June 8, 2020).

180.    MPD Policy specifically states that "[o]fficers shall not deploy 40mm launchers for crowd management purposes." 5-317(III)(D).

181.    MPD's Policy states that 40-mm rounds can cause grievous injury and should be reserved "for the incapacitation of an aggressive, noncompliant subject," 5-317(III)(B), and "unless deadly force is justified," officers should aim for large muscle groups in the lower extremities, 5-317(IV)(B)(1). The policy explicitly advises against targeting a person's head and neck. 5-317(IV)(B)(2).

182.    There have been at least two lawsuits filed against MPD for shooting a rubber bullet into two peoples' eyes, people that were displaying valid journalist credentials and not acting noncompliant or aggressive, causing total blindness in their eyes. *See Jared Goyette v. City of Minneapolis, et al.*, Case No. 20-cv-1302 (WMW-DTS) (D. Minn. June 2, 2020); *Linda Tirado v. City of Minneapolis, et al.*, Case No. 20-cv-1338 (JRT-ECW) (D. Minn. June 10, 2020).

183.    Importantly, the MPD Policy also mandates that a verbal warning be considered "when reasonable under the circumstances:" "As an alternative and/or the precursor to the actual use of force, MPD officers shall consider verbally announcing their intent to use force, including displaying an authorized weapon as a threat of force, when reasonable under the circumstances. The threatened use of force shall only occur in situations that an officer reasonably believes may result in the authorized use of force. This policy shall not be construed to authorize unnecessarily harsh language." 5-304(A) Threatening the Use of Force.

184.    The MPD Policy also encourages the use of de-escalation tactics "whenever reasonable...to avoid or minimize use of physical force." De-escalation tactics listed in the policy include "Avoidance of physical confrontation, unless immediately necessary (e.g. to protect someone or stop dangerous behavior)." 5-304(B)(2) De-escalation.

185.    Finally, MPD Policy mandates that, "as soon as reasonably practical," "any sworn MPD employee who uses force shall...determine if anyone was injured and render medical aid consistent with training and request Emergency Medical Service (EMS) if necessary." 5-306 Use of Force – Reporting and Post Incident Requirements.

186.    As stated above, often times, MPD officers ignored cries of help from Plaintiffs and other protestors for medical assistance after having force used on them.

187.    Defendants' decision to ignore their own policies constitutes a custom and practice of failing to, and refusing to, follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other injured people.

188.    MPD Policy as of May 27, 2020, stated that "[c]ivil disturbances are unique situations that often require special planning and tactics to best bring an unlawful situation under effective control. The on-scene incident commander shall evaluate the overall situation and determine if it would be a reasonable force option to use less-lethal or non-lethal weapons to best accomplish that objective. Unless there is an immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals

43

involved in a civil disturbance until it has been authorized by the on-scene incident commander." 5-312 Civil Disturbances.

189.    On June 16, 2020, MPD amended this section of its Policy to require the authorization for use of crowd control weapons during protests and demonstrations to come from the Chief of Police. "That's certainly a change from allowing supervision on the ground to make that call, because of the serious nature of that kind of level of less-lethal force," Arradondo said.[46] In all other civil disturbances that are not protests or demonstrations, the on-scene incident commander will still make the authorization.

190.    On information and belief, the authorization for use of force was given as a blanket authorization by the on-scene incident commander(s) and was not given on an incident-by-incident basis.

191.    The on-scene incident commander(s) from May 25 to May 31 are mostly unknown[47], but, generally, "[t]he ranking officer or supervisor at the scene of any emergency is the on-scene Incident Commander until relieved of this responsibility by a higher authority. At the scene of multi-agency or multi-department responses, the ranking Fire Department officer will most often be the on-scene Incident Commander, with police functions being traffic control, security and evacuation assistance, in accordance with the

---

[46]    Libor Jany, Liz Sawyer, *Complaints skyrocket over police response to George Floyd protests*, STAR TRIBUNE (July 2, 2020, 10:01 PM), https://www.startribune.com/complaints-skyrocketing-in-wake-of-mpls-police-response-to-floyd-protests/571608232/

[47]    *See* Decl. of Scott Gerlicher, *Goyette v. City of Minneapolis*, No. 20-cv-1302 (WMW-DTS) (D. Minn. June 5, 2020), ECF 27 (stating that he was one of the incident commanders from May 25 to May 31 but providing no additional details about what particular commands and orders he gave).

City's Emergency Operations Plan, Annex F." MPD Policy 7-901 Emergency Response – General Objectives; see also 7-902 Emergency Response – General Responsibilities.

192.    The Police Supervisor, usually a Sergeant or Lieutenant, on-scene will likely be the Incident Commander. 7-905 Incident Command System. "Police personnel will receive direction and orders from police supervisors only, to insure unity of command and the police chain of command." *Id*.

193.    Defendant Kroll was both a Lieutenant in the MPD and the president of the Minneapolis Police Federation, the union that represents Minneapolis police officers. Kroll's supervisory role was amplified significantly by his position as Federation president. Kroll acted as an unofficial policymaker within the MPD. The MPD's customs and practices derives not just from the command structure within the department, but also informally from Kroll, who acted as a *de facto* policy maker for a cadre of officers in the department. Kroll actively sowed discord between rank-and-file officers and the command structure as a means of further amplifying his policy role and exercising an outsize influence over police culture. What Kroll casted as his "opinions" as union president had the practical effect of serving as policy guidance for officers, which aggravated the training and supervision failures described herein.

194.    On June 2, 2020, Kroll released a statement to Federation members that underscores his role as *de facto* policymaker and his failure to supervise with respect to the particular First Amendment issues described in this Complaint.[48] Throughout the

---

[48]   https://minnesota.cbslocal.com/2020/06/01/mpd-union-leader-releases-letter-to-officers-critical-of-minneapolis-leadership/

letter, Kroll reinforces his supervisory role and unofficial policymaker with regard to the

MPD:

> "I've had numerous convers conversations with politicians at the state
> level. I gave a detailed plan of action including a range of 2000 to 3000
> National Guard, their deployment allocations throughout our city
> and St. Paul, in a phone meeting with Senate majority leader Paul
> Gazelka."

He further sowed discord between police officers and local political leadership by

encouraging the conduct of the MPD:

> "I commend you for the excellent police work you are doing in
> keeping your coworkers and others safe during what everyone
> except us refuses to call a riot . . . . The politicians are to blame and
> you are the scapegoats."

195.    Not once did Kroll recognize the constitutional right of Minneapolis

citizens to assemble peacefully and instead couches the events of the days leading up to

his letter as a "riot," "the largest scale riot Minneapolis has ever seen," a "record breaking

riot," and a "terrorist movement." He further encourages the use of gas munitions and

less-lethal munitions by officers "to defend themselves."

196.    However, the identities of those in command and those authorizing the uses

of force are mostly unknown. This information is uniquely in the hands of Defendants

and discovery will bring to light their identities.

### i.   MPD has a pattern and practice of using excessive force.

197.    Defendants did not follow their own policies regarding the use of less-lethal

force in the days following Mr. Floyd's death, resulting in such uses of force being

46

excessive. Worse yet, Defendants have shown a pattern and practice of using excessive force when engaging with civilians.

198.    These shocking stories from peaceful protestors over the mere course of a few days exemplifies the MPD's pattern and practice of using excessive and unreasonable force on people it is meant to serve and protect.

199.    According to http://opendata.minneapolismn.gov/datasets/police-use-of-force/data,[49] a website which tracks MPD's uses of force, from May 25, 2020 to May 31, 2020 alone, there were 82 recorded[50] uses of force deployed by MPD officers. This includes the use of "chemical irritants" (both crowd control mace (i.e., tear gas) and personal mace), "less lethal" (i.e., bean bag rounds), "gun point display, "and "less lethal projectile" (i.e., bean bag rounds, 40mm). Most of the stated reasons why the use of force was deployed is for "assaulted officer," "verbal non-compliance," and "commission of a crime."

---

[49]    Since January 1, 2008, when this website started keeping track of MPD's uses of force, until July 2, 2020, the date last accessed, MPD has used force over 30,000 times. That equates to 6 uses of force every single day for 12.5 years.

[50]    MPD Policy also dictates when uses of force must be reported. 5-306 Use of Force – Reporting and Post Incident Requirements (a CAPRS report but no supervisor notification is required when "chemical agent exposures" are used; "All other force [including non-lethal projectiles], injuries or alleged injury incidents require both a CAPRS report and supervisor notification. The sworn employee shall remain on scene and immediately notify a supervisor by phone or radio of the force that was used.... A CAPRS report entitled "FORCE" shall be completed as soon as practical, but no later than the end of that shift. A supplement describing the use of force incident in detail shall be completed and entered directly into the CAPRS reporting system (no handwritten force reports). Employees shall ensure that all applicable force portions of the CAPRS report are completed in full.")

200.    As of August 17, 2013, MPD was defending itself against 61 lawsuits alleging that officers used excessive force. Fifty-three of those lawsuits were filed from 2011 to 2013.[51] These include the arrest of Darryl Gill, who alleged that an MPD officer ripped out one of his dreadlocks and injured him so severely that he incurred $3,500 in medical bills[52]; the arrest of Sundiata Bronson, who was sitting outside Liquor Lee's when officers told him to leave and, when he refused, rammed him into the front window of the bar which caused significant lacerations to his face, wrist and finger and required 22 sutures[53]; and an incident in which Adolphas Baldwin was struck in the head, thrown to the ground, and kicked repeatedly while handcuffed necessitating 2 staples to close his scalp laceration.[54] The officers who assaulted Baldwin followed him to the hospital and issued him a citation for obstruction and spitting on the sidewalk.

201.    There is a history of MPD using excessive force on civilians dating back to at least the 1980s. From 1983 to 1987, 227 complaints of excessive force were filed against the MPD, none of which were upheld by the City[55].

---

[51]    Randy Furst, *Minneapolis police face lawsuits alleging misconduct*, STAR TRIBUNE (Aug. 17, 2013, 11:14 AM), https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/?c=y&page=1

[52]    Andy Mannix, *Darryl Gill alleges MPD ripped out dreadlock, broke his wrist during arrest*, CITY PAGES (Jan. 30, 2013), http://www.citypages.com/news/darryl-gill-alleges-mpd-ripped-out-dreadlock-broke-his-wrist-during-arrest-video-6540533

[53]    *Supra,* at 36. https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/?c=y&page=1

[54] *Id.*

[55]    Will Cooley, *Minneapolis: The Rise of the 'Thumpers'*, THE NATION (June 1, 2020), https://www.thenation.com/article/society/minneapolis-police-brutality-racism/

48

202.    The MPD has used neck restraints in over 230 arrests since 2015; 60% of

arrestees who were rendered unconscious as a result were Black.[56]

203.    Officer Megan Jones of the MPD has described MPD culture as based on

the mentality that the officers are at war: officers are taught not to question their superiors

and to think of the job as "us versus them"—the "them" being the civilians whom the

MPD has sworn to protect.[57] MPD officers are thoroughly steeped in this culture, as is

evidenced by a 2016 incident in which off-duty MPD officer Efrem Hamilton's squad

car, while responding to a shots fired call, collided with a BMW driving in reverse to get

away from the chaotic area. When Caylea Wade, the driver of the BMW, revved its

engine, Hamilton fired his gun into the car and justified his actions by claiming he feared

for his life[58].

204.    MPD's culture has led officers to believe that they may use excessive force

with impunity. In 2015, 17-year old Hamza Jeylani was arrested by MPD officer Rod

Webber. When Jeylani asked why he was arrested, Webber responded "[b]ecause I feel

---

[56]    Lydia Blanco, *Minneapolis Police have used neck restraints in over 200 arrests since 2015, leaving dozens unconscious*, BLACK ENTERPRISE (June 1, 2020), https://www.blackenterprise.com/minneapolis-police-have-used-neck-restraints-in-over-200-arrests-since-2015-leaving-dozens-unconscious/

[57]    Laura Basset, *A Minneapolis Police Officer Opens Up About the Toxic Culture Inside the Department*, GQ (June 10, 2020),        https://www.gq.com/story/minneapolis-police-officer-interview

[58]    *Jury Acquits Minneapolis Cop Who Shot at Car*, CBS MINNESOTA (Feb. 20, 2018, 3:33 PM), *https*://minnesota.cbslocal.com/2018/02/20/minneapolis-officer-efrem-hamilton-downtown-shooting/

    https://minnesota.cbslocal.com/2018/02/20/minneapolis-officer-efrem-hamilton-downtown-shooting/

like arresting you." In the video taken on Jeylani's cell phone, Webber can also be heard

threatening to "break [Jeylani's] leg" before Jeylani would get the chance to run[59].

205.    MPD's Policy, its unofficial customs and culture, and its deliberately

indifferent failure to train, supervise, and discipline have all led to a pattern and practice

of excessive force.

## CLASS ALLEGATIONS

206.    Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(2) for all

claims for injunctive and declaratory relief.

207.    The classes are so defined:

      a.   For injunctive and declaratory relief: All peaceful protestors who

          were unlawfully subjected to less-than-lethal force by a sworn

          officer of the Minneapolis Police Department from May 25, 2020 to

          May 31, 2020. (the "Peaceful Protest Class")

      b.   For injunctive and declaratory relief: All persons who have been

          subjected to excessive force at the hands of MPD.

208.    A class action is the only practicable means by which Plaintiffs and

unknown members of the class can challenge Defendants' illegal actions.

209.    This action satisfies the numerosity, commonality, typicality, and adequacy

requirements of Fe. R. Civ. P. 23(a):

---

[59]    *Minneapolis Police Officer Tells Black Teen "I'm Going to Break Your Legs"*,
BLACKNEWS.COM (April 6, 2015), https://www.blacknews.com/news/minneapolis-
police-officer-tells-black-teen-im-going-to-break-your-legs-video/

a. **Numerosity**. The exact number of members of the Class is unknown by Plaintiffs, but the Class easily exceeds the numerosity requirement, thereby making joinder impracticable because videos on social media and news-casts suggest that hundreds of peaceful protestors have been unnecessarily and continually subjected to chemical irritants and other "less lethal" methods of force.

b. **Commonality**. All Class members are similarly situated such that Plaintiffs' bring claims based on questions of law and fact that are common to and typical of the putative Class members. Common questions include:

    i. Whether Defendants and/or their agents used greater force than was necessary on peaceful protestors asserting their First Amendment rights;

    ii. Whether the Defendants acted with deliberate indifference to the rights of peaceful protestors asserting their First Amendment rights; and

    iii. Whether Defendants have a pattern and practice of using excessive force.

c. **Typicality**. The claims of Plaintiffs are typical of the claims of Class members. All Class members have suffered and will continue to suffer harm from Defendants' excessive use of force whilst asserting their First Amendment rights.

d. **Adequacy**. Plaintiffs will fairly and adequately represent the interested of the proposed Class and has hired adequate counsel more than adequate to litigate their claims on their behalf.

210. **Fed. R. Civ. P. 23(b)(2) Class**. Plaintiffs seek certification of a Rule 23(b)(2) Class because the Defendants have acted or failed and/or refused to act on grounds that generally apply to the proposed Class, such that preliminary and final injunctive and declaratory relief is appropriate and necessary for each Class member. Under § 1983, the Defendants have systematically deprived individuals of their constitutional rights, privileges, and immunities. The acts and omissions of Defendants are generally applicable to the proposed Class.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### (Excessive Force)
### (Against All Defendants except the City of Minneapolis)

211. Plaintiffs reallege each and every paragraph of this complaint as if they were fully set forth herein.

212. Defendants, acting under the color of state law, violated Plaintiffs' constitutional right to remain free from excessive use of force under the Fourth amendment to the United States Constitution when Defendants used force greater than what was necessary, without justification, on peaceful protestors asserting their First Amendment right of protesting the government.

213.    The amount of force used against the Plaintiffs and Class members was objectively unreasonable under the circumstances.

214.    In particular, the use of pepper spray was objectively unreasonable and constituted excessive force.

215.    The officers on the scene had no reason to fear for their lives, no other lives were in danger, and no felonies were being committed. Plaintiffs and Class members were not posing an immediate threat to the safety of the officers or anyone else by exercising their First Amendment rights to protest the actions and inactions of the government. None of the Plaintiffs or Class members were actively resisting arrest or attempting to evade arrest by flight when less-than-lethal force was used against them.

216.    The MPD officers clearly knew that their actions taken on Plaintiffs and Class members would not be lawful in light of the clearly established law articulated in *Baker v. Chaplin*, 517 N.W.2d 911, 916 (Minn. 1994) and the information possessed by the officers.

217.    As a result of Defendants' actions, Plaintiffs and Class members suffered loss of freedom and liberty, physical pain and discomfort, and severe emotional trauma and distress.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983: *Monell* Municipal Liability**
**(Pattern and Practice of Excessive Force; Failure to Train and Supervise)**
**(Against the City of Minneapolis)**

218.    Plaintiffs reallege each and every paragraph of this complaint as if they were fully set forth herein.

219.    The facts alleged above detail the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the City of Minneapolis's police officers. This is starkly apparent given that the City of Minneapolis has had hundreds of excessive force lawsuits filed against them.

220.    Defendant City of Minneapolis is liable to Plaintiff and all Class members pursuant to 42 U.S.C. § 1983 for the violations of Plaintiffs' rights because the violations were caused by a policy, practice, or custom of the MPD.

221.    The following policies, practices, and customs caused constitutional harm to Plaintiffs and all Class members:

    a.   MPD officers' routine use of objectively unreasonable excessive force when policing protests, especially those at which police brutality is being protested;

    b.   MPD's custom, practice, or policy of using less-than-lethal force, without warning and without time for disbursement, on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

    c.   MPD's policy, practice, or custom of targeting protestors, journalists, and other civilians with objectively unreasonable excessive force, such as firing less-lethal projectiles and tear gas while at close range and without concerns for safety or aggression;

d.  MPD's practice, policy, or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

e.  MPD's custom, policy, and practice of violating the Fourth Amendment by regularly using excessive force on civilians;

f.  To fail to adequately train, supervise, and/or discipline police officers and/or City officials concerning the practices described above to assure compliance with City and/or Department policy, state and federal laws, and the Constitution of the United States.

222.  The long-standing existence of these policies, practices, and customs, and resultant lawsuits, put Defendant City of Minneapolis on notice that a course of training or supervision was deficient in a particular respect.

223.  Because the misconduct complained of above had continued for decades, the City of Minneapolis's officer training and supervision practices are wholly inadequate. The City of Minneapolis's officer-discipline regime is nearly completely lacking.

224.  The City is ultimately vested with the duty, power and authority to train, supervise, discipline and otherwise control the officers of the Police Department. The City failed in its duty to so train, supervise and discipline Defendants in general and specifically so as to conform their conduct with constitutional requirements. Specifically, the City failed to adequately train, supervise and discipline officers of the Police Department/agents of the City in the proper and lawful arrests of subjects; failed to train,

supervise and discipline officers with regard to the duty to intervene and/or report transgressions, and to truthfully respond to inquiries. The city effectively abrogated the power to train, supervise, discipline and control officers of the Police Department/agents of the City, resulting in the constitutional deprivations to Plaintiffs and Class members.

225.    These policies, customs, and practices, along with Defendant City of Minneapolis's repeated failures, evidences Defendant City of Minneapolis's deliberate indifference to, or implicit authorization of, the violations of the constitutional rights of Plaintiffs and all Class members.

226.    Plaintiffs and all Class members were injured by the City of Minneapolis's indifference or authorization to allow Plaintiffs and all Class members to be subjected to excessive force by MPD officers because they failed to correct the actions of the officers, discipline officers, or change the policies and culture of the MPD.

227.    Had the City of Minneapolis adequately trained and supervised and disciplined its officers, Plaintiffs and all Class members would not have been deprived of their constitutional rights to be free from excessive force and to peacefully protest.

228.    Defendants' unlawful use of excessive force was willful and recklessly indifferent to the constitutional rights of Plaintiffs and Class members as evidenced by the repeated violations of their constitutional rights to be free from excessive force.

229.    Defendant City of Minneapolis's failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiffs as alleged herein.

230.   As a direct result of the Defendant City of Minneapolis's failures and policies as described herein, Plaintiffs suffered damages including: physical injury, fear, apprehension, and concern for their own safety.

231.   Defendants are jointly and severally liable to Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**(Retaliation for the Exercise of First Amendment Freedoms**
**of Free Speech and Assembly)**
**(On Behalf of The Peaceful Protest Class only)**
**(Against All Defendants)**

232.   Plaintiffs reallege each and every paragraph of this complaint as if they were fully set forth herein.

233.   Plaintiffs and Peaceful Protest Class members have a fundamental right to assemble and express their views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

234.   From May 25 to May 31, Plaintiffs and Peaceful Protest Class members were lawfully exercising their First Amendment rights to free speech and the right to peacefully assemble.

235.   Plaintiffs and Peaceful Protest Class members were not exhibiting violence and were not a threat to officers. Plaintiffs and Peaceful Protest Class members attempted to follow orders from law enforcement, when they were given, though often times the orders were not given.

236.    Plaintiffs and Peaceful Protest Class members were not under arrest or displaying probable cause sufficient for an arrest when they were subjected to excessive force in retaliation for exercising their First Amendment rights.

237.    Defendants used less-than-lethal force against Plaintiffs and Peaceful Protest Class members to prevent the exercise of their constitutional rights. The repeated use of less-than-lethal force against Plaintiffs and Peaceful Protest Class members violated their right to engage in constitutionally protected activities.

238.    Plaintiffs and Peaceful Protest Class members, while peacefully protesting or trying to leave the protest after disbursement orders had been given or trying to leave once officers began deploying force when no disbursement order was given, were repeatedly the victims of excessive force.

239.    At all times, Defendants acted under color of law.

240.    Defendants' unlawful use of excessive force was willfully, knowingly, and recklessly indifferent to the constitutional rights of Plaintiffs and Peaceful Protest Class members as evidenced by the repeated violations of the constitutional rights of Plaintiffs and Peaceful Protest Class members.

241.    Plaintiffs and Peaceful Protest Class members suffered physical injury as a direct and proximate result of Defendants' violations of their First Amendment rights.

242.    Defendants' unlawful and repeated use of excessive force on Plaintiffs and Peaceful Protest Class members caused an injury to them that would chill a person of ordinary firmness from continuing to exercise their constitutional right to peacefully protest.

243.    As a direct and proximate result of Defendants' unlawful actions described

herein, Plaintiff and Peaceful Protest Class members suffered damages including:

physical injury, emotional trauma, great concern for their own safety; fear, apprehension,

depression, anxiety, consternation and emotional distress.

244.    Defendants are jointly and severally liable to Plaintiffs and Peaceful Protest

Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members respectfully request this Court:

A.    Enter judgment in favor of Plaintiffs and Class members and against the

Defendants;

B.    Declare that Defendants have infringed on the First Amendment rights of

Plaintiffs and Class members;

C.    Declare that Defendants have retaliated against Plaintiffs and Peaceful Protest

Class members for exercising their First Amendment rights;

D.    Declare that Defendants used excessive force on Plaintiffs and Class Members;

E.    Declare that Defendants have a pattern and practice of using excessive force

against the citizens of Minneapolis, Plaintiffs, and Class Members ;

F.    Enjoin and prohibit Defendants from continuing its use of excessive force;

G.    Award Plaintiffs monetary damages in an amount that is fair and reasonable to

compensate them for the damages they have suffered;

H.    Award Punitive damages against Defendants;

I.      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 1988 and any other applicable provisions of law; and

J.      Allow such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs request a jury trial as to all issues triable by a jury.


Dated:  June 14, 2022                              Respectfully submitted,


                                                    _s/Joshua J. Rissman_____
                                                   Daniel E. Gustafson (#202241)
                                                   Joshua J. Rissman (#391500)
                                                   Frances Mahoney-Mosedale (#0402741)
                                                   **GUSTAFSON GLUEK PLLC**
                                                   Canadian Pacific Plaza
                                                   120 South 6th Street, Suite 2600
                                                   Minneapolis, MN 55402
                                                   Telephone: (612) 333-8844
                                                   Facsimile: (612) 339-6622
                                                   dgustafson@gustafsongluek.com
                                                   jrissman@gustafsongluek.com
                                                   fmahoneymosedale@gustafsongluek.com


                                                   *Attorneys for Plaintiffs*